UNITED STATES of America, Plaintiff,

v.

The CITY AND COUNTY OF SAN FRANCISCO, et al., Defendants,

and

San Francisco Firefighters Local 798, et al., Defendants in Intervention.

Fontaine DAVIS, et al., Plaintiffs in Intervention,

v.

The CITY AND COUNTY OF SAN FRANCISCO, et al., Defendants,

and

San Francisco Firefighters Local 798, et al., Defendants in Intervention.

Nos. C–84–1100 MHP, C–84–7089 MHP.

United States District Court, N.D. California.

Aug. 25, 1988.

Supplemental Order Awarding Attorneys' Fees Aug. 31, 1988.

Eva Jefferson Paterson, San Francisco Lawyers' Committee for Urban Affairs, Shauna I. Marshall, Equal Rights Advocates, William C. McNeill, III, Employment Law Center, Denise M. Hulett, Mexican–American Legal Defense & Educational Fund, San Francisco, Cal., Dennis W. Hayashi, Asian Law Caucus, Oakland, Cal., Mary C. Dunlap, Law Offices of Mary C. Dunlap, San Francisco, Cal., Russell Galloway, Berkeley, Cal., for plaintiffs in intervention.

Robert T. Moore, Richard S. Ugelow, U.S. Dept. of Justice, Civil Rights Div., Employment Litigation Section, Washington, D.C., Joann Swanson, Dept. of Justice, San Francisco, Cal., for Dept. of Justice.

Duane W. Reno, Cindy O'Hara–Varela, Davis, Reno & Courtney, San Francisco, Cal., for Firefighters Union, Local No. 798.

Louise K. Renne, City Atty., George Riley, Judy Lynch, Deputy City Attys., San Francisco, Cal., for the City & County of San Francisco.

Barbara Y. Phillips, Rosen & Phillips, San Francisco, Cal., Special Monitor.

## ORDER GRANTING INJUNCTION

PATEL, District Judge.

This employment discrimination action was originally brought by the United States against the City and County of San Francisco ("the City") citing unlawful discrimination on the basis of race by the San Francisco Fire Department ("SFFD"). Various individuals and organizations later intervened as plaintiffs [1] adding claims for unlawful discrimination on the basis of gender, and San Francisco Firefighters Local 798 ("the Union") intervened as a defendant. A consent decree was entered in settlement of this action on May 20, 1988. An order approving the terms of the consent decree was filed June 10, 1988. See *United States v. City and County of San Francisco*, 696 F.Supp. 1287, 1319 (N.D. Cal.1988) [hereinafter *"Davis III"*].

The ink was hardly dry on the consent decree when the City entered the throes of a budget crisis and sought to make cuts in the SFFD budget in order to ameliorate the financial shortfall. The case came on for hearing before the court on an order to show cause why the defendant should not be held in contempt for violating the orders of this court and on the City's belated request for an emergency hearing on the budget. The court received evidence and heard argument over the course of a four day hearing. Having considered the memoranda and submissions of the parties as well as the evidence taken and arguments offered during the hearing, for the following reasons, the court orders that the City is permanently enjoined from reducing the number of authorized positions in the SFFD, and from demoting SFFD personnel other than for legitimate disciplinary reasons. Further, although the court does not find that the City is yet in contempt of court, the City shall bear the costs and attorneys' fees related to the hearing on contempt.

## BACKGROUND

The detailed factual background of this case was outlined in *Davis III* and will not be repeated here. In any event, it is the events subsequent to the filing of the con-

---

1. Plaintiff-intervenors are: Fontaine Davis, Eric H. Washington, Jerilyn North, Robert L. Demmons, Jimmie Braden, Audry Lee, Early Davis, Brandi Swanson, Susan Moorehead, Anne Young, Mary M. Carder, Theresa Rodigou, Kathleen J. Bradshaw, Patricia Murray, Chinese for Affirmative Action (CAA) and the Mexican American Legal Defense Fund (MALDEF).

sent decree that are pertinent to the current motions.

The court ordered the filing of the consent decree on May 20, 1988. That same day the parties came before the court on an order to show cause re contempt arising from the City's failure to provide adequate information to the court or to the parties regarding test development. Before the end of that hearing the plaintiff-intervenors informed the court that the City was planning demotions in the SFFD as a way to resolve a budgetary shortfall. After some discussion, the court enjoined the City from taking any adverse employment action until the City had prepared and the court had had an opportunity to review a report on the effects any budgetary changes might have on the consent decree. That bench order was later memorialized and filed June 22, 1988.

In response to the court's demand for a report spelling out the ramifications of proposed budget cuts for the provisions of the consent decree, on May 26, 1988 the City filed a document of less than two pages. That document, based on the prediction that a local proposition on the June 7 ballot would allow the city to raise revenues in excess of the Gann limit,[2] baldly asserted that the trimming of the SFFD budget would have little effect on the City's ability to comply with its obligations under the consent decree. On June 7 the voters rejected the proposition that would have overridden the Gann limit. The City failed to submit a subsequent report until after the plaintiff-intervenors moved the court to find the City in contempt.

In the interim, the Union had appealed both the entry of the consent decree and the opinion in *Davis III* to the Ninth Circuit and had moved for a stay pending appeal. On June 13, a panel of the court of appeals temporarily granted a stay pending appeal.

By letter dated June 15, 1988, attached to this order at Appendix A, the City reported to the court that the failure of the ballot proposition would not affect its ability to comply with its obligations under the con-

sent decree because the Gann Amendment allowed the City "to exclude from the Gann limit those additional expenditures for services which have been mandated by the court." In an appended memorandum to the Mayor dated June 14, 1988 the City Attorney explained more specifically that by its terms the Gann Amendment excluded "[a]ppropriations required for purposes of complying with mandates of the courts or the federal government which, without discretion, require an expenditure for additional services or which unavoidably make the providing of existing services more costly." In that memorandum, the City Attorney identified for the Mayor the City's obligation to hire 500 new firefighters as one of the requirements of the consent decree which could be exempted under Gann.

On June 24, the monitor filed with the court a report on the budget. The monitor reported that the City planned to deactivate one division, one battalion district, one rescue squad and up to four truck companies on July 1, 1988. This plan included the elimination of 186 authorized positions in the SFFD. Also on June 24, on plaintiff-intervenors' motion, the court issued an order to show cause why the City should not be held in contempt and reiterated its prior order enjoining the City from taking any action which might adversely impact on its ability to fulfill its obligations under the consent decree.

On June 30 a majority of the Ninth Circuit panel lifted the temporary stay and denied the Union's motion for a stay pending appeal.

Hours after the Ninth Circuit lifted the stay, the City swore 81 new lieutenants into the SFFD pursuant to the terms of the consent decree. On the next day, July 1, the City appeared before the court on the order to show cause and announced almost in one breath the promotion of the 81 lieutenants and its plan promptly to demote 28 of those new lieutenants as part of the proposed budget for fiscal year 1988–89

---

**2.** The Gann Amendment, Cal. Const., Art. XIIIB, with certain exceptions, imposes a limit on the expenditures of tax revenues by the state and local governments.

partially outlined in the monitor's June 24 report.

In response to the court's specific questions about the ramifications for the terms of the consent decree of the City's proposed 1988–89 budget ("the proposed budget") for the SFFD and the other parties' charges of misrepresentation, the City responded only that it intended to comply with the terms of the decree and that the parties and the court were obliged to trust in the City's good intentions. The court demanded that the City submit the declarations of those officials responsible for developing the SFFD budget on the subject of the ramifications of the proposed budget for the consent decree, and continued the hearing to the following week. Deputy Mayor for Finance Sam Yockey, Assistant V for budget analysis Kathryn Harrison and Fire Chief Frederick Postel submitted declarations and testified at the hearing.

The SFFD is organized by divisions, which break down into battalion, engine and truck companies. *See* Administration chart appended to Monitor's Report Re Budget [hereinafter "Monitor's Budget I"]. For fiscal year 1988–89, beginning July 1, 1988 the City proposed to reorganize the SFFD by consolidating its three divisions into two, reducing its ten battalions to nine, eliminating four truck companies and one rescue squad. *See* Defendant's Report on Fire Department Budget Cuts and Administrative Reorganization [hereinafter "City's Budget II"] at 4–5.

This reorganization of the SFFD would have a double-barrelled effect on the number of authorized positions in the SFFD. First, by direct elimination of the companies and by the process of "bumping," [3] between 42 and 62 promotional opportunities would be lost. Second, the proposed budget would directly eliminate 136 entry-level hiring opportunities.

The reduction in authorized positions would not result in any layoffs because due

to its now legendary inability to devise entry-level and promotional tests that are valid under Title VII, the City for many years has been prevented from hiring or promoting firefighters. As a result, the actual strength of the SFFD has diminished over the years. Therefore, the City's proposal to eliminate authorized positions would have the effect of shrinking the authorized strength of the SFFD to meet its present staffing. According to Chief Postel, absent retirements, the proposed budget would leave only three positions available to be filled in the rank of H2 firefighter.

The proposed budget made other straight funding cuts. Despite the City's protestations that the requirements of the consent decree would be fulfilled, the testimony and other evidence demonstrated unequivocally that these cuts would adversely affect the SFFD's ability to provide incoming recruits and incumbent officers with human relations and officer training, to provide counseling services to a force which has been experiencing a marked increase in both incidents of racial harassment and stress-related disability, to actively recruit in minority communities and among women, to retrofit firehouse facilities in order to accommodate women, and to investigate and eliminate racial and sexual harassment within the SFFD.

DISCUSSION

In reviewing the arguments of the parties, the court is not unsympathetic to the City's fiscal woes. However, it is dismaying that the City was prepared to effect such drastic changes in the SFFD without either reporting to the court or to the parties or first applying to the court for modification of its obligations under the consent decree. For the first time in twenty years the City had developed a workable solution to the problems of employment discrimination in the SFFD; it did little to protect

---

**3.** Bumping is what happens when a uniformed officer above the rank of firefighter H2 is demoted and there are, as in this case, no open slots in the ranks below. For example, when a battalion chief is demoted to captain, a captain must be demoted to lieutenant and a lieutenant will be demoted to firefighter. So when a high ranking officer is bumped, his position, and one in every rank below is eliminated unless additional positions are created in the rank or ranks below, something which will not occur under this plan.

that solution. The conclusion is inescapable that the City cannot hope to fulfill its obligations under the decree if it cuts the SFFD's budget in the manner proposed. Under the circumstances, it was the City's obligation to move the court to relieve it of its duties under the consent decree. Instead, the City ignored its responsibility and forced the plaintiff-intervenors to come to court to prevent the City from implementing cuts which would cripple the consent decree from the outset. Even at the hearing, the City attempted to let its case rest on representations of good faith rather than hard evidence as to its ability to meet its obligations.

It is also disheartening that the City made so little effort to muster support for fully funding the consent decree and so readily conceded to cuts in the SFFD budget. The City's protestations about the workings of the Gann amendment were highly unconvincing.[4] The Gann amendment contains an express exclusion for court orders such as the consent decree. The fact of the matter is that the City did not even attempt to exclude the known costs of the consent decree from the City's Gann calculation, although the costs of other consent decrees and federal court orders were indeed excluded and fully funded. At bottom, it is not at all clear that the City is unable to appropriate the moneys to fund the decree fully as contemplated by the parties.

The City officials in charge of formulating the SFFD budget testified at the hearing that they had not been given a copy of the consent decree, that they had not had an opportunity independently to evaluate whether the budget would allow the SFFD to comply with the terms of the decree, and that when the experts were unsure of whether the budget would support compli-ance, the City Attorney had given them a bald legal opinion that the terms of the consent decree were met. In fact, every time the court questioned Ms. Harrison or Chief Postel about numbers that would not add up, the standard answer was to the effect that each had been assured by the City Attorney that the terms of the decree would be met. The court was shocked to learn not only that the decree had not been provided to the officials in charge of the budget, but that provisions fundamental to the decree, such as the minimum of 500 hires over the course of the decree, were presented to them by the City Attorney as something less than firm requirements.

The City's failure to request relief before planning this proposed budget is completely at odds with its obligations. It also skewed the posture of the parties on the motion. If the City had moved the court for a modification of the consent decree, it would have been its burden to demonstrate an inability beyond its control to comply with the terms of the decree. For the reasons stated below, the City failed to meet this burden.

Even if the court places the burden on plaintiff-intervenors as movants for injunctive relief, that burden has been met. Permanent injunctive relief is justified by findings indicating that "the movant has no adequate remedy at law and will suffer irreparable harm if the court denies equitable relief." *Burrus v. Turnbo*, 743 F.2d 693, 699 (9th Cir.1984), *vacated as moot*, 474 U.S. 1016, 106 S.Ct. 562, 88 L.Ed.2d 548 (1985). Of course, the court also has broad discretion to fashion equitable relief in order to enforce the provisions of the consent decree, over which it retains jurisdiction for the next seven years.[5] *See Davis III*, 696 F.Supp. at 1321.

4. Section 9(b) of the Gann amendment permits local governments to exclude the costs of court-ordered programs from the Gann calculation. The City's argument is that once those programs are eliminated from the calculation, it may then raise and spend revenue up to the limit without considering or providing for the costs of such programs. The City refused to concede that the exclusion in fact permits it to raise the revenues necessary to fund the programs excluded under Gann. The court finds this a strained analysis of section 9(b). The exclusion relates *directly* to the court-ordered programs and clearly contemplates that such programs be funded.

5. Although the City concedes that this court retains jurisdiction to enforce the consent decree, it contends that the court lacks jurisdiction to interfere in the uniquely political process of formulating a budget. The notion that the two are unrelated is disingenuous. The City as-

The court is loath to get into specifics regarding the City's decision to allocate its resources. It is not the court's province to create a budget for the SFFD or for the City. It is the court's function, however, to ensure that the consent decree is carried out and to evaluate whether the proposed budget is likely to render the City incapable of realizing the terms of the decree. In this case, there is clearly no adequate remedy at law; the potential harm posed by the proposed budget is irreparable in that those job opportunities sought to be eliminated, once lost, will irreparably damage the rights to relief negotiated for in the consent decree. In reaching this conclusion, the court's starting point is the City's obligations under the consent decree. Those obligations are both specific and general.

I. *The Obligation to Hire 500 Firefighters*

Under paragraph 9 of the decree, *see Davis III*, 696 F.Supp. at 1314, the City is obliged to hire "at least 500 entry level firefighters" over the seven year course of the decree. The problem however, is not merely the City's inability under the proposed budget to meet the 500 figure, but the ramifications of a failure to meet that figure for the rest of the decree. This figure is an essential part of the foundation on which the consent decree stands. By making 500 hires impossible to attain, the proposed budget would undermine the entire scheme of relief.

First, the evidence is uncontroverted that under the proposed budget the City will not have 500 openings in the SFFD in the next seven years. There was a great deal of skirmishing at the hearing over retirement rates and what a reasonable prediction as to the number of openings after retirement will be in the next seven years. While the court finds that the City's estimates as to the predicted rate of retirement were not credible, even the City's best prediction of 374 retirements over the next seven years, *see* Declaration of Kathryn Harrison Regarding Retirement Rates at 4, would not create vacancies sufficient to meet the number of hires required to support the consent decree. The Union's estimate, which, unlike the City's figures,[6] was supported by specific evidence of the age and years of service of each of the current members of the SFFD in addition to raw averages of historical trends, predicted only 267 retirements, or an average of 38 per year, over the same seven year period. *See* Declaration of Duane Reno filed July 13, 1988.

Second, the City claims that the proposed budget contemplates a class of at least 24 to begin the fire college in fiscal year 1988–89. There are two problems with this assertion. First, under the proposed budget there are only places for three new hires. This means that in order to hire a class of twenty-four in the 1988–89 fiscal year, absent twenty one retirements, the SFFD would need to obtain a supplemental appropriation. This process involves fourteen steps, can take as long as eight or nine months and may finally be denied by the board of supervisors. *See* Monitor's Budget III at 2–5. Second, in order to meet the trigger numbers for testing deadlines set out in the decree, the City must have 90 new firefighters trained by March of 1990. If the City only budgets to train 24 this year, it will have to assemble funds to hire and train 66 firefighters next year, which

---

sumed certain obligations by the terms of the decree, which are founded on the assumption that there are funds to carry out the obligations. To the extent that the City seeks to solve the budget crisis on the back of the SFFD, the court has jurisdiction to ensure that budget determinations do not interfere with the City's obligations under the decree. Indeed, there would be little incentive for litigants to settle actions with local governments if the courts allowed them to escape their obligations by crying fiscal constraint. *See Liddell v. Missouri*, 731 F.2d 1294, 1320–22 (8th Cir.), *cert. denied*, 469 U.S.

816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984). The City accepted the obligations of the consent decree and will be held to carry out its obligations in full.

6. The City's figures also failed to take into consideration the fact that the SFFD cannot fill the positions of firefighters who begin their retirement on the basis of lump sum sick pay until that lump sum is fully paid out. *See* Monitor's Budget III at 5.

would require an additional 66 retirements plus additional training funds and salaries. The reconfiguration of the department will make it next to impossible to reach the trigger on the specified date.

Third, the hiring goals for minorities and women are predicated on 500 hires and it was on the basis of that number of hires that the court approved the hiring goals in the consent decree. The City's argument that 500 hires are not required by the terms of the decree is belied by the fact that in the memorandum to the Mayor of June 14, 1988, the City Attorney stated that the "consent decree requires the City to hire 500 new firefighters...." Appendix A, Memo at 7. If the City fails to hire 500 new firefighters over the course of the decree, achievement of the remedial goals of the decree would require an increase in the levels of hiring of minorities and women. The City does not pretend that such an increase in minority hiring could be justified under current law on the basis of the record before the court.

Lastly, with respect to the issue of 500 hires, the City's protestation that it will be able to make up in later years for what it plans to take away from the SFFD this fiscal year is simply not credible. There is no basis either in the history of the City or in the history of other cities for the hope that down the road, the City's financial picture will become so glowing as to allow it to increase the authorized strength of the SFFD to current levels after reducing it by almost a third.

## II. *The Obligation to Promote Captains*

Paragraph 11 of the consent decree, *see Davis III*, 696 F.Supp. at 1314, specifically requires the City to give a special captain's examination to six named Black firefighters and to integrate the results of that test with the existing captain's list, immediately promoting to captain those of the six who place in the range of names already promoted from the list. Under the proposed budget, there are no openings for captains. The City's answer to this problem is to pledge that it will promote these men to

captain but give them the work of lieutenants.

This attempted resolution is unacceptable. The consent decree contemplates providing these men with the kind and quality of work necessary to qualify them to compete with others of the same rank. Placing those who qualify for the rank of captain in lieutenant's jobs will handicap them in competing for the next promotional rank. While White captains will have been experienced in performing the duties of captain, these Black captains will have been performing not captain's but lieutenant's work. The decree does not contemplate such a result and the court cannot permit the City to put these captains at such a disadvantage or to discriminate against them in the type of assignments made.

The proposal to reduce the number of authorized positions by reconfiguring the SFFD amounts to an anticipatory repudiation by the City of its obligations under the consent decree. The City cannot give away the store and then claim that damage is purely speculative and that there has as yet been no breach for which relief may be afforded.

Because the City cannot live up to its obligations under paragraphs 9 and 11 of the consent decree under the proposed budget, the court permanently enjoins the City from making any reductions in the number of authorized positions in the SFFD. This does not mean that the City is required immediately to fill all authorized positions. It does mean that these positions must remain funded in the quantity and quality required by the spirit and tenor of the consent decree and available for hiring and promotion in the numbers and at the times required by the terms of the consent decree. At the times called for there must be sufficient numbers of positions of true responsibility in the required ranks to effectuate the hiring and promotions contemplated by the decree. In the absence of an injunction, the consent decree would be worthless paper. The court declines to offer the city any relief from the commitment to 500 hires over seven years, or from the

goals, triggers or test dates set out in the decree.

### III. *The Proposed Demotions*

The City was not required by the terms of the consent decree to promote a full complement of 81 lieutenants. The consent decree, however, does not contemplate demotions. In the judgment of the court the City was cavalier in promoting 81 with full knowledge that it intended the very next day to demote 28 of those promoted. There is little indication that the City took account of the effects of the demotions. The fact that two of those promoted would be demoted to a rank lower than that they gave up in order to be promoted to the rank of lieutenant is a prime example of the City's callousness and disregard. *See* Declaration of Eva Paterson filed July 11, 1988. Moreover, to hold out the promise of promotion and then to demote would be in violation of the spirit and tenor of the consent decree. Accordingly, the City is enjoined from making any demotions other than for legitimate disciplinary reasons.

### IV. *The Obligations to Train and to Provide Necessary Support*

As part of the consent decree, the City undertook to provide a range of training in addition to the usual fire suppression training of new recruits. Specifically, there must be special physical training for women. In addition, in conjunction with its obligation to investigate and punish incidents of racial harassment against members of the SFFD, the City must provide human relations training for all its members. The reductions in the portion of the proposed budget relating to training will make this impossible. Chief Postel made clear that there must be at least 6 full time officers in the bureau of training, two of whom have the rank of captain H39 or above.

The court expresses no opinion on the City's decision to "civilianize" the positions that will be in charge of investigating racial harassment. This decision should be left to the SFFD. The personnel assigned to this job, however, must have the training, experience, authority, supervision and resources to effectively carry out their duties under the consent decree.

The court will not involve itself in specifying what amount of funds or personnel need be provided in order to accomplish these general obligations. The findings of the monitor, which shall be made in consultation with Chief Postel and the SFFD head of training, will be given presumptive effect with respect to the adequacy of resources allotted to all training.

### V. *Contempt*

Although the City was courting contempt, the court does not find that the City went so far as to be in actual contempt either of the consent decree or of the order of May 22, 1988. However, the City did violate its obligation to provide information about its intentions to the court and to the parties. Instead of coming into court to seek a modification, the City acted unilaterally to abrogate the court's order and forced the plaintiff-intervenors to seek relief. Accordingly, the costs and attorneys' fees related to this motion will be assessed against the City. The parties have ten days from July 12, 1988 to submit declarations and demands for fees. The City will then have ten days to respond.

The City is cautioned for the future to read its obligations in the spirit clearly intended by the consent decree. It is the City's responsibility to move for modification of its obligations before instituting changes which may have an adverse effect on the rights protected by the consent decree.

### CONCLUSION

For the foregoing reasons, the City is enjoined from reducing the number of authorized positions in the SFFD from the level authorized at the time of the execution of the consent decree and from making any demotions for other than legitimate disciplinary reasons. In addition, the recommendations and conclusions of the monitor made in consultation with Chief Postel and the SFFD head of training will be deemed conclusive with respect to the resources allocated to the bureau of training.

Further, although the motion for contempt is denied, the City is ordered to pay costs and attorneys' fees related to this motion in an amount to be determined by supplemental order.

IT IS SO ORDERED.

### APPENDIX A

City and County of San Francisco:
Office of City Attorney

Louise H. Renne,

City Attorney

Dan Siegel

Chief of Complex Litigation

(415) 554-4229

June 15, 1988

The Honorable Marilyn Hall Patel
United States District Court
450 Golden Gate Avenue
San Francisco, CA 94102

Re: *U.S.A. vs. City and County of San Francisco* USDC No. C84-7089 MHP/C84-1100 MHP (Consolidated)

Dear Judge Patel:

Last week, we informed you and all parties by letter that the failure of Propositions K and 71 in the general election might affect the City's ability to comply with portions of the consent decree which require the expenditure of public funds. These propositions, had they passed, would have raised the so-called "Gann" limit which sets a ceiling on the amount of money which can be spent by local government.

Since that time, it has come to our attention that in calculating its Gann limit, the City has never applied an exemption set forth in section 9(b) of the Gann Amendment. See Cal. Const., Art XIII, § 9(b). In essence, that section permits local governments to exclude from the Gann limit those additional expenditures for services which have been mandated by a court.

Yesterday, in a memorandum to the Mayor, the City Attorney stated that the exemption under section 9(b) applies to consent decrees such as the one in this case, as well as to other court mandates affecting the City. The City is currently recalculating its Gann limit consistent with this view. We are hopeful that recalculation of the Gann limit will provide the City with sufficient space to meet all of its obligations under this and other mandates.

At the same time, we recognize that whether the City has the necessary funds to meet its obligation is an issue entirely separate from whether the Gann limit prohibits their expenditure. Currently, the Finance Committee of the Board of Supervisors is reviewing the budget and considering a variety of matters affecting the revenues available to meet required expenditures.

At this time, we do not fully know how recalculating the Gann limit will affect our continued ability to meet our responsibilities. Various revenue measures are being considered. We shall keep the Court and the parties informed as the facts become known to us.

A copy of the City Attorney Opinion on the Gann limit is enclosed with this letter.

Very truly yours,
LOUISE H. RENNE
City Attorney
/s/ Dan Siegel
DAN SIEGEL
Chief of Complex Litigation

cc: Barbara Phillips (w/encl.)

All Counsel (w/o encl.)

2129G/jan

---

### CITY AND COUNTY OF SAN FRANCISCO

### MEMORANDUM

TO: HONORABLE ART AGNOS Mayor
FROM: LOUISE H. RENNE City Attorney
BURK E. DELVENTHAL
Deputy City Attorney
DATE: June 14, 1988
RE: GANN APPROPRIATIONS LIMIT/COURT MANDATES

## I. *Introduction*

On November 6, 1979, the people of the State of California adopted the Gann Amendment, an initiative measure adding Article XIIIB to the California Constitution. Article XIIIB was intended to accomplish two major objectives. First, it imposed a limit on the expenditure of "proceeds of taxes" by the State and each local government (i.e., an "appropriations limit"). Second, subject to certain exceptions, it required the State to provide a subvention to reimburse local governments for the costs of any State mandated "new program or higher level of service." Cal. Const., Art. XIIIB, § 6.[1]

This memorandum is directed at the first of those two policies—limitations on expenditures of taxes. In particular, this memorandum discusses section 9(b) of the Gann Amendment, which excludes from the definition of "appropriations subject to limitation" the following: "Appropriations required for purposes of complying with mandates of the courts or the federal government...."

We consider here the meaning of this exclusion and its application to litigation in which the City has been required to expend funds to comply with court orders. We conclude that in the circumstances discussed below, expenditures required to comply with those court orders appropriately should be excluded from the Gann limit.

Although section 9(b) does permit the City to spend the funds necessary to comply with court mandates without being subject to the Gann limit, whether the City has the necessary funds is an entirely separate issue not addressed in this memorandum. In the event the City does not have the necessary resources to comply with existing consent decrees, the City must seek modifications of court mandates to avoid contempt proceedings.

## II. *Background*

Critical to the implementation of Article XIIIB is the annual calculation by each government entity of its "appropriations limit." This calculation must be followed by an assessment of the local government's "expenditures subject to limitation," and a determination that such expenditures have not exceeded the "appropriations limit." The appropriations limit is based upon the local government's total appropriations of tax proceeds during the base year period July 1, 1978—June 30, 1979. Art. XIIIB, section 8(h); Gov.Code § 7902(a). The limit is adjusted annually for changes in the cost of living and population. Art. XIIIB, § 1; Gov.Code § 7902(b). If the government entity's appropriations of tax proceeds exceed its Gann limit, it must return the excess proceeds of taxes to the taxpayers. Art. XIIIB § 2; Gov.Code § 7911.

In sum, determination of whether the Gann limit is exceeded requires an understanding of two distinct concepts. The first is the appropriations limit—the ceiling imposed by Article XIIIB on each government entity's expenditures of tax proceeds. The second is the "appropriations subject to limitation," which is the actual expenditure of tax proceeds that must be kept within the Gann limit. Not all expenditures of tax proceeds are "appropriations subject to limitation" within the meaning of Article XIIIB.

This memorandum addresses court-mandated expenditures—one class of expenditures excluded from the determination of whether a government entity has exceeded its appropriations limit. In past years, the City did not attempt to exclude court mandates from the City's total appropriations subject to limitation. The City was so far below its Gann limit that there was no need to identify and calculate excluded court mandates.

Because of a recent decision of the Court of Appeal, *Santa Barbara County Taxpayers Assn. v. County of Santa Barbara* (1987) 94 Cal.App.3d 674, this situation has changed. *Santa Barbara* addressed the question of whether appropriations to fund

---

**1.** Unless otherwise indicated, all citations to sections will refer to Article XIIIB of the California Constitution.

a county employees' retirement system should be excluded from calculation of the Gann limit as an appropriation to pay an indebtedness. Article XIIIB, section 9(a) excludes "debt service" from the category of appropriations subject to the Gann limit. Debt service is defined in section 8(g) to include the cost of interest and redemption on any indebtedness incurred as of January 1, 1979.

Like Santa Barbara, San Francisco and many other local governments had treated appropriations to pay voter-approved retirement system obligations as outside the appropriations limit. However, the *Santa Barbara* court held that retirement system funding obligations are not indebtedness within the meaning of Section 8(g). Accordingly, San Francisco is faced with the prospect of including within its appropriations limit expenditures necessary to fund its employee retirement systems. Under such a recalculation, the amount of money the City may expend for purposes other than funding the retirement system will be significantly lower than under the pre-*Santa Barbara* practice.[2]

Applying the *Santa Barbara* rule, the Controller has indicated that the level of expenditure contemplated in your proposed budget for fiscal year 1988/89 may approach the City's appropriations limit. Accordingly, you have asked our office to determine whether there are any expenditures mandated by the courts for fiscal year 1988/89 that should be excluded in calculating whether the City will exceed its appropriations limit.[3]

### III. *Analysis*

Authorizations to expend proceeds of taxes are identified by Article XIIIB, sections 8(a) and (b) as "appropriations subject to limitation." However, Article XIIIB, section 9(b) excludes from the definition of "appropriations subject to limitation" the following:

"Appropriations required for purposes of complying with mandates of the courts or the federal government which, without discretion, require an expenditure for additional services or which unavoidably make the providing of existing services more costly."

Hence, in calculating whether its total appropriations exceed its appropriations limit, the City is directed by the express terms of Article XIIIB to exclude expenditures required to comply with certain mandates.

Section 9(b) sets forth three criteria which must be satisfied to meet the scope of this exclusion. First, there must be a court or federal mandate.[4] Second, under the mandate, the City must have no discretion to avoid making expenditures. Third, the mandate must either (a) require the City to make an expenditure for additional services, or (b) unavoidably make existing services more costly. Unfortunately, there is no judicial precedent or statutory guideline addressing the meaning of each of these three criteria.[5] Accordingly, we must interpret section 9(b) based upon its plain meaning, history and intent.

*(1) Court Mandates.* The term "mandate" is defined in part in Webster's Third New International Dictionary (1981) as follows:

---

2. Treating expenditures for the retirement system as "appropriations subject to limitation" means including them in both the base year calculation and in each subsequent year's computation of total appropriations subject to limitation. Since retirement costs have grown at a greater rate than our Gann limit, treating those costs as "appropriations subject to limitation" means that they consume an increasingly large proportion of the appropriations limit.

3. In addition, we are examining whether there are other federal mandates and unreimbursed state mandates that could also be excluded from the computation of appropriations subject to

limitation. Further, we have informally advised your office and the Controller that a downward adjustment of the Gann limit in 1981 as a result of a Municipal Railway fare increase was not required and that the Gann limit can be recalculated to eliminate that adjustment.

4. In this memorandum, we address only the issue of court mandates, not federal mandates.

5. We have conferred with members of the staff of the Legislative Analyst. They concur that there are no applicable precedents. They also agree with the interpretation of section 9(b) set forth below.

"[A] formal order from a superior court or official to an inferior one; an authoritative command, order, or injunction; a clear instruction, authorization, or direction...."

In his argument in support of the Gann Initiative, Paul Gann wrote: "This amendment is a reasonable and flexible way to provide discipline in tax spending at the state and local levels...." Adopted in the wake of Proposition 13, the Gann initiative was commonly known as the "Spirit of 13." When viewed in conjunction with Proposition 13's constraints on property taxation and special taxes, it is evident that the underlying purpose of Article XIIIB was to prevent profligate spending.

Analyzed in this light, section 9(b) is a logical exception to the strictures of the Gann limit; expenditures compelled by court mandate are not within a local government's control. Article XIIIB should be interpreted to hold accountable state and local government entities only for those expenditures they can control. In sum, whether the City is under a court "mandate" turns on whether it is required by a court to expend funds which it would not otherwise expend.

A writ of mandate issued by any state or federal court directed at the City or any of its officials is the most obvious form of court mandate within the meaning of section 9(b). Injunctions—whether in the form of temporary restraining orders, preliminary injunctions or permanent injunctions—which require service-related expenditures beyond the control of the government entity also constitute court mandates within the meaning of section 9(b).

The issue has arisen as to whether a consent decree approved by a court following settlement of an actual controversy between the City and an adverse party constitutes a court mandate within the meaning of section 9(b). A consent decree which has been reduced to a judgment is like any other court order. Once the judgment has been entered, the City is under compulsion to comply with its terms. Violation of a consent decree is punishable by contempt of court.

As noted, the purpose of Article XIIIB is to require the state and each local government to account for its discretionary spending. A consent decree negotiated by the City to avoid a costly trial and potentially greater liability constitutes a court mandate within the meaning of section 9(b).

*(2) Without Discretion.* The test is whether the City is engaging in the activity under compulsion of a court mandate. In many instances, court mandates direct the defendant to undertake some activity or to provide some minimal protections without specifying how the defendant is to carry out the mandate or without establishing the precise limits of the mandate. A common-sense reading of section 9(b) is that activities undertaken to comply with a court order must be deemed "without discretion" if they are reasonably necessary to respond to the the court mandate.

*(3a) Require an Expenditure for Additional Services.* An expenditure will be excluded from the calculation of appropriations subject to limitation if it provides services in addition to those provided before the court mandate. In our view the term "services" should be construed to include the full range of government functions, from the provision of a cell to an inmate in the City's jail to the treatment of waste water.

*(3b) Unavoidably Make the Providing of Existing Services More Costly.* This language contemplates expenditures necessary to comply with a court mandate that requires the City to provide an existing service in a more costly fashion. Examples would include court orders requiring the City to administer examinations more frequently or requiring that jail inmates receive medical treatment from specialists rather than general practitioners. Such expenditures should be excluded from the calculation of appropriations subject to limitation.

### IV. *Application*

You have inquired about the exclusion's application to two kinds of court mandates requiring the City to expend additional

funds: (A) consent decrees and (B) back pay judgments. Within each of these categories, we address a number of specific court mandates. There are undoubtedly other court mandates which we shall be analyzing in the future.

A. *Consent Decrees.*

1. *Stone v. City and County of San Francisco,* U.S. District Court for the Northern District of California Docket No. C78–2774. In *Stone,* inmates and former inmates of the City jail brought a civil rights action alleging that the conditions at the jail violated their Eighth Amendment rights to be free of cruel and unusual punishment. The complaint addressed inadequate medical services and overcrowded conditions. In 1982, the City entered into a consent decree. Pursuant to that decree and court orders issued to enforce it, the City is required to provide higher staffing levels, to augment medical services at the City jail and to construct additional modular jail facilities at San Bruno to eliminate overcrowding. If the City fails to comply with the consent decree and court orders, the City can be fined.

We conclude that the consent decree and subsequent court orders in *Stone* are "mandates of the courts" within the meaning of section 9(b). The City has no discretion and must incur expenses to provide additional medical services and more space to prisoners to comply with the court orders in *Stone.* Therefore, we conclude that appropriations necessary to comply with the decree and orders in *Stone* should be excluded from the calculation of whether the City has exceeded its appropriations limit.

2. *United States of America v. City and County of San Francisco,* United States District Court, Northern District of California Docket Nos. C84–7098 MHP and C84–1100 MHP ("Firefighters"). These cases involved allegations that the selection and promotion policies of the City and County of San Francisco for firefighters discriminated against women and minorities. On June 10, 1988, the District Court formally approved the consent decree.[6] Among other things, that consent decree requires the City to hire 500 new firefighters, develop and administer new examinations, pay for a court-appointed monitor, adopt procedures to resolve complaints, and promote minority firefighters.

This consent decree is a mandate of a court within the meaning of section 9(b). The City has no discretion and must incur expenses to comply with the decree. The appropriations should be excluded if those expenses would not have been incurred but for the court's order. The test is whether the court has required the City to provide fire protection above historically based levels. In addition, any other appropriations to meet the requirements of the decree, such as employing a court monitor or test consultants, should be excluded from the computation of whether the City has exceeded its appropriation limit. They render the services provided by the Fire Department more costly.

3. *Officers for Justice v. City and County of San Francisco,* United States District Court, Northern District of California, Docket Nos. C73–0657 RFP and C77–2884 RFP. In this action, as in the Firefighters' case, the plaintiffs' basic allegations were that the City's hiring and promotional policies for police officers discriminated against women and minorities. The consent decree and supplemental order require the City to recruit and test police officers, develop and administer examinations, contract with an auditor-monitor, and make certain promotions. In addition, they set minimum staffing levels.

This decree and court order are also mandates of a court within the meaning of section 9(b). To the extent the decree and order require staffing levels above historically based levels of staffing, they require expenditures for additional services within

---

6. On June 13, 1988, as this letter was being prepared, the Ninth Circuit issued an order staying the consent decree in this case. Although this stay places a temporary cloud on the resolution of this issue, we believe that the stay was issued simply to give the Court time to consider the merits of the challenge to the consent decree. We believe that the court will ultimately sustain the decree and dissolve the stay.

the meaning of section 9(b). Further, other expenses required to comply with the decree which either provide for additional services or make the existing Police Department operation more costly (for example, increasing the ratio of sergeants, lieutenants and captains to entry level officers) should be excluded from the calculation of whether we have exceed our appropriations limit.

## B. *Back Pay Cases.*

The Mayor's FY 1988–89 budget includes $17 Million for back pay litigation. This reserve relates to four cases: (1) *Union of American Physicians v. Civil Service Commission,* Action Nos. 789–050 and 868–490; (2) *Corriea v. Civil Service Commission,* Action No. 837–759; (3) *Schach v. Britt,* Action No. 716–384; and (4) *Deputy Sheriffs Assn. v. City and County of San Francisco,* Action No. 840–397.

These cases arise from claims that the City underpaid various classes of City workers. In each case, a court ruled against the City. The $17 million reserved for the four judgments include approximately $8.1 million in back pay awards and approximately $8.9 million in prospective salary increases for FY 1988–89, consistent with the courts' rulings.

Each ruling is a mandate of a court within the meaning of section 9(b). Under each ruling, the City has no discretion and must incur additional expenses to comply with the mandates should they become final.

The issue is whether those mandated expenditures would "make the providing of *existing* services more costly." Clearly, increasing salaries for workers who provide existing services makes those services more costly. A question may arise, however, as to whether *back pay* awards—as opposed to prospective salary increases— raise the cost of *"existing"* services.

One view is that a back pay award makes *past* services more expensive but not "existing" services. Another view is that the term "existing" services was intended simply as a counterpoint to the term "additional" services in section 9(b). "Additional" services are *new* services which a court has required. "Existing" services are those which a government has provided before the court mandate. If a court has required that such traditional services be provided in a more costly way, such extra expenditures are outside the Gann limit.

Under the latter view, a court-ordered award of back pay has the effect of raising the cost of traditional or "existing" City services and qualifies for exemption from the Gann limit. Such an award simply raises the cost of traditional services retrospectively.

In our opinion, a court is likely to sustain the latter view. The Gann Amendment was designed as a "flexible and reasonable way to provide discipline in tax spending." If the cost of providing traditional services has increased because of a court order beyond the government's control, that increase is not the result of a lack of discipline in spending.

Moreover, if in the base year of 1978–79, the City had paid salaries at the higher levels now mandated by the courts, the City's Gann limit would have been higher all along. Raising the Gann limit to account for court-ordered, back pay expenditures would have the effect of putting that limit where it should have been.

With the Controller, we are examining other mandated expenditures to determine whether they should be excluded from the computation of appropriations subject to limitation.

L.H.R.

## SUPPLEMENTAL ORDER AWARDING ATTORNEYS' FEES

This order supplements the order of permanent injunction filed August 25, 1988. Counsel for plaintiff-intervenors and the Union have filed applications for attorneys' fees pursuant to 42 U.S.C. § 1988. Having considered the applications for attorneys' fees and the supporting documents, as well as the opposition to those applications raised by the City, the court denies the Union's application for attorneys' fees and grants the application of plaintiff-intervenors.

## BACKGROUND

This action against the City and County of San Francisco ("the City"), which sought redress for employment discrimination on the basis of race and sex by the San Francisco Fire Department ("SFFD"), was settled as between the plaintiff-intervenors and the City by entry of a consent decree on May 20, 1988. An order approving the terms of the consent decree was filed June 10, 1988. See *United States v. City and County of San Francisco*, 696 F.Supp. 1287, 1319 (N.D.Cal.1988) [hereinafter "*Davis III*"]. The court retained jurisdiction over the action pursuant to the terms of the consent decree, which will remain in effect until 1995. *See id.* at 1321.

By Order filed August 25, 1988 [hereinafter "*Davis IV*"], following a hearing on contempt, the court permanently enjoined the City from reducing the number of authorized positions in the SFFD below the level allowed at the time of the execution of the consent decree. *Davis IV* maj. op. at 769–70. Although the court did not hold the City in contempt of court, it did rule that the City had violated its obligation to move the court for relief from its obligations under the consent decree before taking action which would impair its ability to perform its obligations under the decree. *Id.* at 769. For this reason, the court ordered that the City would be held liable for the fees and costs related to the contempt proceedings. *Id.*

## DISCUSSION

Counsel for plaintiff-intervenors as well as defendant-intervenor San Francisco Firefighters Local 798 ("the Union") have filed applications and declarations in support of their claims for attorneys' fees. The City opposes any award of fees to the Union on the grounds that it is not a prevailing party within the meaning of 42 U.S.C. § 1988, and argues that any award to counsel for the plaintiff-intervenors should be substantially less that what has been requested.

A district court may authorize an award of attorneys' fees to a prevailing party in a civil rights action under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. In the absence of special circumstances, a prevailing plaintiff should recover reasonable attorneys' fees. *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir.1986) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983)), *as amended*, 808 F.2d 1373 (9th Cir.1987).

If the court determines that an applicant is a prevailing party who should be awarded attorneys' fees under section 1988, it must next determine what fees are reasonable. In this circuit, reasonable attorneys' fees are determined by first calculating the "lodestar." *Jordan v. Multnomah County*, 815 F.2d 1258, 1262 (9th Cir.1987). The lodestar is found "by multiplying the number of hours reasonably expended on litigation by a reasonable hourly rate." *Chalmers*, 796 F.2d at 1210; *accord, Keith v. Volpe*, 833 F.2d 850, 859 (9th Cir.1987). There is a strong presumption that the lodestar figure represents a reasonable fee. *Jordan*, 815 F.2d at 1262.

### I. *The Union's Application*

The Union is not a party to the consent decree. In fact, prior to the onset of the City's budget crisis, the Union steadfastly opposed the consent decree, which it has appealed to the Ninth Circuit. Nevertheless, at this juncture the Union claims to be a prevailing party because its contribution to the hearing achieved the Union's continuing purpose in this litigation of "protect[ing] its members from unlawful discrimination and/or race conscious remedies not warranted by past discrimination on the part of the City against minorities." Union's Application at 8.

The City's proposed budget reductions would indeed have had the effect of making some of the provisions of the consent decree more onerous to white male firefighters than otherwise. The opposition to the City's proposed budget and the resulting injunction prevented that occurrence. However, the concern for the added burden to be borne by white firefighters was only incidental to the ultimate goal of the hearing, which was to preserve the entire consent decree, the heart of which is an affirmative action plan.

Throughout this litigation, the Union has been categorically opposed to all affirmative action remedies. Therefore, the notion that the Union may be considered a prevailing party to a motion brought to preserve the consent decree is wholly disingenuous. While the court is gratified by the way in which the Union came to the defense of the consent decree, and while the court hopes the benefits that have accrued to the members of the Union as a result of the decree will cause the Union to recognize the best interests of all firefighters and to rethink its position on the consent decree, the court cannot recognize the Union as a prevailing party in this action.

It is not disputed that the Union's contributions at the hearing were pertinent, informative and relied upon by the court. However, the mere fact that the Union helped achieve the purposes of the plaintiff-intervenors at a time when it suited the interests of the Union to do so does not entitle the Union to prevailing party status. *Cf. Morales v. Turman,* 820 F.2d 728, 730–31 (5th Cir.1987) (neither common law nor section 1988 provides a basis for awarding attorneys' fees to amici).

The fact remains that until the Union fully embraces the consent decree by becoming a signatory, it has no standing or status with respect to actions taken to enforce the consent decree, other than that permitted on an ad hoc basis in the discretion of the court. On this occasion, over the repeated objections of the City, the court permitted the Union to be heard. However, as the fortuitous beneficiary of enforcement of the very decree it refuses to endorse, the Union cannot claim prevailing party status.

Accordingly, the Union's application for an award of reasonable attorneys' fees pursuant to section 1988 is denied.

## II. *The Applications of Plaintiff-Intervenors*

Plaintiff-intervenors are quite clearly prevailing parties. It remains to be determined whether the amounts claimed by their counsel are reasonable attorney's fees.[1]

In calculating the lodestar, the court must determine both a reasonable number of hours and a reasonable hourly rate for each attorney. *Chalmers,* 796 F.2d at 1210. In calculating a reasonable number of hours, the applicant must justify her claim by submitting detailed time records. The court may adjust these hours downward if it believes the documentation to be inadequate, if the hours were duplicative, or if the hours were either excessive or unnecessary. *Id.*

Determining a reasonable hourly rate is a critical inquiry. *Jordan,* 815 F.2d at 1262 (citing *Blum v. Stenson,* 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984)). The court must consider several factors including the experience, skill and reputation of the applicant. *Chalmers,* 796 F.2d at 1210. The court must look to the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience and reputation; it may not refer to the rates actually charged to the prevailing party. *Id.* at 1210–11. It is the applicant's burden to produce evidence, other than the declarations of interested counsel, that "the requested rates are in line with those prevailing in the community for similar services of lawyers of reasonably comparable skill and reputation." *Jordan,* 815 F.2d at 1263.[2]

---

**1.** Plaintiff-intervenors are made up of several classes and subclasses, so there are several attorneys involved. The application was submitted on behalf of William C. McNeill, III of the Employment Law Center; Eva J. Paterson of the San Francisco Lawyer's Committee for Urban Affairs; Shauna I. Marshall of Equal Rights Advocates; Mary C. Dunlap, a sole practitioner; and Denise M. Hulett of the Mexican American Legal Defense and Education Fund (MALDEF) [hereinafter referred to as "the applicants"]. With the exception of Ms. Dunlap,

each of these attorneys is a salaried employee of a public interest organization. Accordingly, excepting Ms. Dunlap, any fees awarded will be awarded and paid to the organizations for which these attorneys work.

**2.** In *Jordan,* the Ninth Circuit declined to consider the sufficiency of the evidence required to support a claimed hourly rate. 815 F.2d at 1263 n. 9. The court was inscrutable on the issue of whether a declaration stating the rate requested

In addition, in figuring a reasonable fee, the court should consider the outcome of the action, the customary fees and whether a contingent fee arrangement is involved, and the novelty or difficulty of the issues presented. *Chalmers*, 796 F.2d at 1211 (citing *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir.1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976); *Hamner v. Rios*, 769 F.2d 1404, 1407–09 (9th Cir.1985)).

The City has three principal objections to the plaintiff-intervenors' application. Each of the City's arguments is without merit and may be disposed of easily.

First, the City avers that whatever amount is awarded, the total should be reduced because the plaintiff-intervenors failed to achieve all their goals. While it is true that the court failed to find the City in contempt of court, it is also true that the plaintiff-intervenors achieved in full the substantive purpose of their motion, which was to preserve the authorized strength of the SFFD and the programs provided for under the consent decree.[3]

Nevertheless, the City continues to claim that it was unnecessary for the plaintiff-intervenors to scrutinize in detail the line-items of the proposed budget. This argument is wholly disingenuous in view of the fact that it was the court that demanded such detail and that the court was forced to demand such detail after the City proffered only protestations of its good faith as a substitute for hard evidence of its plans.[4] The level of detail presented at the hearing regarding the City's proposed budget was necessary in order to still a moving target. Finally, the idea that the City was willing to discuss the proposed budget before implementing it lacks credibility in view of the fact that the City was prepared to execute the proposed budget on July 1 before presenting it to the court.

The fact of the matter is that the City intended to put its budget into effect without ever having taken a hard look at the ramifications that budget would have for its obligations under the consent decree. The evidence at hearing showed that the City took a cavalier approach toward the decree, suggesting to its staff that it could unilaterally tinker with the decree, and either readily convince the court of its ability to comply or obtain dispensation from the court. That particular mistake in judgment resulted in a lengthy hearing and substantial work on short notice by counsel and the court. Shifting attorneys' fees to the City is the cost of that mistake.

The City's second argument is that the hours claimed by the applicants should be reduced as excessive. The principal basis for this claim is that the plaintiff-intervenors used too many attorneys. As the City is well aware, however, this is a class action comprising a number of sub-classes. As often happens in complex litigation of this kind, the interests of all the subclasses are not precisely aligned on all issues. This requires that on every motion before the court, all counsel prepare and confer. The City should always be aware that when its actions spawn litigation it will be responsible for all reasonable attorneys' fees for all parties adversely affected by its actions.

Having reviewed the declarations of the applicants, the court finds that the hours applied for were neither redundant, duplicative nor excessive, but only those necessary to the adequate representation of each attorney's clients.[5]

---

was comparable to the declarant's own rates would be sufficient. *Id.*

3. Further, the great bulk of time was devoted to merits of granting an injunction rather than to proving the contumacious conduct of the City.

4. The City treads on very thin ice when it claims that the detailed examination of the proposed budget was uncalled for. In the court's judgment, had it been asked, the City would have been hard pressed to show that all its figures

added up. This belief is bolstered by the fact that the City Attorney was finally forced to admit that not all the programs required by the consent decree were fully funded and that supplemental appropriations would be required.

5. The one exception to the conclusion that the hours claimed are not duplicative is that paralegals for MALDEF and the Lawyers' Committee have both charged for hours related to researching the jurisdiction of the court after a stay pending appeal. Both cannot recover. The

Further, the City's complaint that the use of law clerks was unnecessary is meritless. If the applicants had used attorney hours on those paralegal chores generally assigned to law clerks in this profession, the City would be complaining of overcharging. *See Jacobs v. Mancuso*, 825 F.2d 559, 563 & n. 6 (1st Cir.1987) (the use of paralegals should be encouraged to reduce the more costly hours of counsel).

Finally, the City argues that the declaration of James L. Hunt is insufficient to establish that the hourly rates claimed by the applicants are reasonable as prevailing rates in the community. Although the standard and quantum of evidence required to establish a reasonable hourly rate has not been established in this circuit, *see* note 2, *supra*, the Hunt declaration provides the court with a sufficient level of detail to be able to determine that the hourly rate requested by each applicant is the prevailing rate in the community for attorneys of similar skill, experience and reputation working on similar litigation.

Further, in reply to the City's opposition to the fee application, plaintiff intervenors have submitted the declarations of Guy T. Saperstein and Jack W. Loden. These declarations demonstrate conclusively that the rates requested by the applicants, including the rates for paralegal work, are well within the rates prevailing in the Bay Area for attorneys of like skill, experience and reputation working on litigation of similar subject and complexity.

CONCLUSION

The Union's application for reasonable attorneys' fees is denied and the application of plaintiff-intervenors is granted. Within thirty (30) days of the date of this order the City shall pay to the appropriate parties, see *supra* note 1, the amounts as set forth in the Appendix to this order as reasonable attorneys fees and costs.[6] That amount totals $52,974.16.

IT IS SO ORDERED.

### APPENDIX

#### Allocation of Fees and Costs to be Paid by City

| Counsel | Hourly Rate | × | Total Hours | = | Fee |
|---|---|---|---|---|---|
| William C. McNeill, III | $230 | | 51 | | $ 11,730 |
| Eva J. Paterson | 220 | | 62.05 | | 13,651 |
| Anthony Rolmero | 70 | | 17.5 | | 1,225 |
| Margot Rosenberg | 70 | | 26.5 | | 1,855 |
| Shauna I. Marshall | 170 | | 77.5 | | 13,175 |
| Mary C. Dunlap | 220 | | 7.5 | | 1,650 |
| Denise M. Hulett | 110 | | 76.7 | | 8,437 |
| Jonathan Abady | 70 | | 11.4 | | 798 |

| | |
|---|---|
| TOTAL FEES: | $52,521.00 |
| TOTAL COSTS: | 453.16 |
| TOTAL FEES AND COSTS: | $52,974.16 |

memorandum which was finally submitted appears to have been a collaborative effort, but was submitted under the signature of MALDEF counsel. Accordingly, the hours of Anthony Romero of the Lawyers' Committee are reduced by 8.5 hours.

6. In the application, plaintiff-intervenors claimed costs totalling $870.52. The supporting declarations, however, serve to justify only $453.16 in costs. Accordingly, that is the amount awarded. See Appendix.