**LOCAL 1812, AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, Plaintiff,**

**v.**

**UNITED STATES DEPARTMENT OF STATE, et al., Defendants.**

Civ. A. No. 87–0121.

United States District Court,
District of Columbia.

April 22, 1987.

Elizabeth St. Clair, Abbey R. Rubenfeld, New York City, New York, William C. Walsh, Washington, D.C., for plaintiff.

Richard Greenberg, John R. Tyler, Department of Justice, Washington, D.C., for defendants.

## MEMORANDUM

GESELL, District Judge.

This case arises from the Department of State's recent decision to expand its employee medical fitness program for all Foreign Service employees seeking to qualify or who have qualified for worldwide service abroad, by including mandatory testing of blood for the presence of the Human Immunodeficiency Virus ("HIV"), the cause of Acquired Immune Deficiency Syndrome ("AIDS") and related diseases. Plaintiff union, which represents some of the employees subject to the program, has moved for a preliminary injunction to bar this blood testing. Numerous declarations and other material have been filed and the issues have been elaborately briefed and argued.

Pursuant to the Foreign Service Act of 1946, as amended by the Foreign Service Act of 1980, codified at 22 U.S.C. §§ 3901–4026 (1982), the Department of State has established "a health care program to promote and maintain the physical and mental health" of Foreign Service employees and their families. 22 U.S.C. § 4084(a). Authority for requiring medical examinations is found in several sources. The statute provides specifically that the Department of State "shall prescribe, as appropriate, written, oral, physical, foreign language, and other examinations for appointment to the Service...." 22 U.S.C. § 3941(b). Also, the health care program established by the Secretary "may include (1) medical examinations for applicants for employment, [and] (2) medical examinations and inoculations or vaccinations, and other preventive and remedial care and services as necessary, for members of the Service and employees of the Department who are citizens of the United States and for members of their families...." 22 U.S.C. § 4084(b).

Medical concerns addressed by the examinations focus significantly on the commitment of Foreign Service employees to undertake worldwide duty. Congress has provided that "[c]areer members of the Service shall be obligated to serve abroad and shall be expected to serve abroad for substantial portions of their careers." 22 U.S.C. § 3984(a). The legislative history of this provision stresses that "availability for worldwide assignment must be clearly expressed and understood as a basic requirement for admission to the Foreign Service as well as for retention and promotion in the Foreign Service throughout the individual's career." H.R.Rep. No. 96–992, 96th Cong., 2d Sess., pt. 1, at 9 (1980); *see also* S.Rep. No. 96–913, 96th Cong., 2d Sess., at 46 (1980), U.S.Code Cong. & Admin.News 1980, pp. 4419, 4463.

The Foreign Service employee medical fitness program is outlined in Volume 3, Section 680 of the Foreign Affairs Manual. It applies to all U.S. citizen Foreign Service employees and their eligible dependents, including spouses and unmarried children under age 21. The program implements the requirement that Foreign Service candidates and their dependents pass, prior to appointment, a comprehensive medical examination designed "to determine the presence of any physical, neurological, or mental condition of such a nature as to make it unlikely that they would be able to function on a worldwide basis." 22 C.F.R. § 11.-1(e)(2) (1986). Current Foreign Services employees and dependents must repeat the examination roughly every two to three years principally upon change of tour of duty and, if significant health problems are detected, such employees are limited in assignments abroad to posts where medical facilities are adequate to care for their condition. The content of the examination is frequently changed to reflect evolving

medical practice and experience. The examination has long included a variety of laboratory tests, including a number of tests done on blood extracted from each person subject to the examination. This blood testing has provided a wide range of general information about a person's health and has also allowed detection of a variety of diseases, both infectious and non-infectious, such as hepatitis, syphilis, sickle-cell anemia, and various forms of cancer.

In November 1986, following a detailed task force study lasting approximately a year and a half, the Department of State announced its decision to add to its medical examination procedure the challenged blood test designed to detect HIV infection by measurement of the presence of antibodies to the virus. This reflected its determination that HIV-infected persons are impaired and medically unfit for worldwide service, because such persons would be put at serious hazard by service at many posts where medical care is wholly inadequate to deal with HIV-related infection, and health and sanitary conditions are particularly hazardous to carriers of the virus.[1] As with other serious medical conditions, a finding of medical unfitness due to HIV infection accordingly bars new applicants from employment with the Foreign Service. Current employees and their families, on the other hand, are given limited medical clearances. The Department of State has determined that HIV-infected individuals showing no symptoms of related disease and without significant immune system dysfunction, as determined by further blood tests, are eligible for placement in the United States and 47 posts in 19 foreign countries which do not present unusual health hazards and where adequate medical care is believed to be available. Individuals in more serious condition are limited to United States service. No employee will be separated, and benefits will not be affected, by a finding of HIV infection.

The Department of State presented substantial medical evidence supporting its view that HIV-infected individuals placed on worldwide service status would be at significant and progressively serious medical risk. Although there is much still to be learned about HIV infection, it is clear that a substantial percentage of persons carrying the virus—and perhaps a majority—will probably develop any of a wide variety of medical problems, principally AIDS or the less severe AIDS-related complex,[2] in a relatively short period from date of infection. There is, moreover, credible medical evidence that HIV-infected individuals placed in countries with levels of infectious disease substantially higher than in the United States will experience enhanced stimulation of their immune systems, through either exposure to disease or to required live-virus vaccines, which can hasten development of AIDS or AIDS-related complex.

The Department of State has also taken cognizance of the fact that because of the complexity of the associated diseases, a physician unfamiliar with HIV infection and unaware that a patient is infected may

---

1. Other grounds for the Department's decision, not sufficiently developed to be controlling on the motion, were to protect against the risk of HIV transmission through emergency blood transfusions at foreign posts and to prevent damage to American foreign policy that will result in some circumstances from the identification of a Foreign Service employee as an AIDS patient or symptomless carrier of the virus, given the attitude in some countries that Americans may be the principal channel for the spread of AIDS.

2. AIDS is a clinical definition developed in 1982 by the Public Health Service's Centers for Disease Control to allow monitoring of conditions typically associated with severe breakdown of immunologic defenses against viral, bacterial and parasitic infections, subsequently found to be caused by HIV. Clinically the term includes "opportunistic" infections that develop because of immunologic breakdown and seldom endanger a person with a healthy immune system, such as *Pneumocystis carinii* pneumonia, tuberculosis, and infections of the central nervous system such as toxoplasmosis; as well as certain cancers, notably Kaposi's sarcoma and non-Hodgkin's lymphomas. A variety of other serious conditions related to AIDS but not meeting the clinical definition of the disease are described as involving AIDS-related complex. These include persistent lymph node enlargement, fatigue, persistent fever, weight loss, diarrhea, and certain neurological problems, including dementia.

misdiagnose symptoms of HIV infection, thus delaying beneficial care; physicians relied on at many foreign posts are less familiar with HIV-related diseases than those in the United States and certain Western European nations.[3] HIV-infected individuals also benefit from the availability of adequate emergency care should they suddenly manifest life-threatening symptoms. Moreover, symptomless HIV-infected individuals derive at least some medical benefit from regular medical monitoring of their condition. Thus, the absence of adequate medical knowledge and care at many posts greatly enhances the medical risks associated with assigning HIV-infected employees to these areas.[4]

■ Plaintiff raises two major objections to blood testing for HIV infection which require comment.[5]

First, it asserts that the testing constitutes an unreasonable search in violation of the Fourth Amendment to the Constitution and a severe privacy intrusion in violation of the substantive due process component of the Fifth Amendment. These arguments are closely related in their focus on the reasonableness of the testing program, and they draw on the view held by many experts that mandatory testing has little, if any, impact on the spread of HIV-related disease and the obvious fact that given the present intense national concern with AIDS there are often damaging psychological reactions caused when one learns he or she is carrying the virus which may trigger it,

particularly when one has not voluntarily sought a blood test.

■ However, the testing program challenged in this case is not primarily directed at stopping the spread of HIV infection. Rather, its focus is on fitness for duty in a specialized government agency. The testing involves only an additional examination of a blood sample that the person undergoing an examination must provide as a matter of course under procedures already established for a number of years. On the evidence presently before the Court, inclusion of the test for HIV infection appears rational and closely related to fitness for duty. The Department of State has acted to ensure tests are conducted in a reasonable manner to protect privacy. While obviously psychological concerns of a deep personal nature may arise when a person is informed of HIV infection following a test, these concerns do not themselves raise constitutional privacy issues, especially as other serious diseases—notably cancer—that may be revealed by blood tests undoubtedly present similar concerns.

The Court must conclude on the present record that the likelihood plaintiff will prevail on the merits of its constitutional claim is insufficient to justify a preliminary injunction against the testing program.

Second, plaintiff asserts that the testing program violates Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 791–796i (1982), which prohibits discrimination

---

3. Because of the breadth of the diseases associated with HIV infection and the ambiguity of their early symptoms in at least some cases, misdiagnosis appears to be a substantial danger. Of the ten federal employees serving overseas who were diagnosed during the past two years as having AIDS, only one was correctly diagnosed at a foreign post, which had relatively sophisticated medical facilities. Two cases were seriously misdiagnosed at foreign posts.

4. The legislative history of the Foreign Service Act of 1980 confirms the Department of State's concerns. The House report described conditions at 46 "hardship posts" in Africa, for example, as follows: "[h]igh heat and humidity, a hostile natural environment, unsanitary conditions, tropical diseases such as malaria, hepatitis, cholera, and meningitis are endemic to many of these posts. Inadequate hospitals, a

shortage of doctors or nurses, and few flights in and out of the capital city, which are necessary in cases of medical emergency, combine to present considerable health hazards to individuals serving at these posts." H.R.Rep. No. 96–992, 96th Cong., 2d Sess, pt. 1, at 7 (1980).

5. Plaintiff also claims the program should have been proposed and debated within the elaborate rulemaking procedures of the Administrative Procedure Act, detailed at 5 U.S.C. § 553 (1982). The inclusion of an additional blood test within an established intra-agency medical and health program cannot remotely be characterized as involving a legislative rule requiring such procedures. Plaintiff's further claim that the program is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A) (1982), hinges on the merits of the two major objections to the program.

against handicapped persons, *see* 29 U.S.C. § 794. The Foreign Service is made subject to the Rehabilitation Act by 22 U.S.C. § 3905(e)(4).

Persons who carry HIV may be deemed handicapped in one or both of two ways. It is enough if they are perceived to be handicapped, *see* 29 U.S.C. § 706(7)(B)(iii). In the present period of speculation and concern over the incurable and fatal nature of AIDS there is no doubt that a known carrier of the virus which causes it is perceived to be handicapped. Plaintiff relies solely on this aspect, contending that persons may under normal circumstances in the United States carry HIV for years, be completely well, and perform efficiently. Were this the sum total of the problem under the circumstances of this case, an injunction might be required. The Department of State could not justify testing for the virus if its presence did not impact on job qualifications for worldwide Foreign Service duty.

However, the Department of State, while disputing that HIV-infected persons are perceived as handicapped, concedes applicability of the Rehabilitation Act on the ground that the great majority of HIV carriers are physically impaired and handicapped only for that reason, under 29 U.S.C. § 706(7)(B)(i), due to measurable deficiencies in their immune systems even where disease symptoms have not yet developed.

Plaintiff vigorously disputes the Department's conclusion that symptomless HIV carriers are in any way impaired,[6] or that at the great majority of its Foreign Service posts the functions of such carriers would be likely to be impaired through greater risk of infection or less competent medical care. Plaintiff's views find little support in

the record. The Court is satisfied that the Department of State has demonstrated serious ground for concern about the additional risk that disease will develop from placement of HIV carriers in many foreign posts and that medical care at such posts will be inadequate to diagnose and treat medical problems that may develop in any infected person.

The Rehabilitation Act only protects an "otherwise qualified individual" from suffering employment limitations "solely by reason of his handicap," 29 U.S.C. § 794. It does not appear from the present record that HIV-infected persons are "otherwise qualified" for worldwide Foreign Service duty. The Rehabilitation Act does not require the Department of State to ignore the obvious relevance of HIV infection to its qualification of Foreign Service employees for long terms of worldwide duty abroad. *See, e.g., Strathie v. Department of Transportation,* 716 F.2d 227, 230–31 (3rd Cir.1983); *Doe v. New York University,* 666 F.2d 761, 775 (2nd Cir.1981). Furthermore, the record is devoid of any purpose or intention to discriminate. The present record discloses sufficient prospect of serious harm to the Department of State's mission and to its employees to warrant continued testing and consequent limitation on assignment or hiring. Again, the prospects of success on the merits are slight. Every effort is being made to accommodate existing employees found to carry the virus and the balance of the equities and the public interest warrant continuation of the challenged testing program until final resolution of the issues.[7]

Moreover, the Court must recognize plaintiff's apparent lack of standing to claim the full relief requested by its complaint. Plaintiff does not speak for all

---

**6.** The issue of whether symptomless HIV-infected persons are impaired within the meaning of the Rehabilitation Act was noted but not decided by the Supreme Court in *School Bd. of Nassau County v. Arline,* —— U.S. ——, 107 S.Ct. 1123, 1128 n. 7, 94 L.Ed.2d 307 (1987).

**7.** Any further accommodation would require the Department of State fundamentally to alter its medical fitness program's allowance of service only at posts where the Department reason-

ably believes medical care is adequate to an employee's situation, or to incur an undue financial burden in upgrading medical care services at all foreign posts to deal with the relatively rare problems associated with HIV infection. The Department of State's obligation reasonably to accommodate handicapped employees does not extend this far. *See School Bd. of Nassau County v. Arline,* —— U.S. ——, 107 S.Ct. 1123, 1129 n. 10, 94 L.Ed.2d 307 (1987).

Foreign Service employees or many potential applicants. No current Foreign Service employee or family member has joined this suit and testing has so far disclosed very few HIV-infected employees. Thus the Court must take cognizance of the possibility that plaintiff may lack organizational standing to represent its members under the standards developed by the Supreme Court in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), and *International Union, UAW v. Brock*, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986), recognizing the highly individualized nature of the problem and possible conflicts between Foreign Service employees or within their families. Finally, the Court is not persuaded that a change in the status quo is in the public interest.

Plaintiff's motion for a preliminary injunction is denied.