Robert PLOWMAN, Plaintiff,

v.

UNITED STATES DEPARTMENT OF the ARMY, the Army Moral Support Fund, and Col. Ernest Isbell, Defendants.

Civ. A. No. 88–0795–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Oct. 19, 1988.

John N. Hauser, Gilmur R. Murray, Eli W. Gould, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., Kenneth Labowitz, Fagelson, Schonberg, Payne & Arthur, Oakton, Va., for plaintiff.

John R. Tyler, Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

### INTRODUCTION

In this case, a former civilian employee of the Department of the Army in South Korea claims that the Army and his former supervisor violated his constitutional and common law rights. The alleged violations arose out of a single incident—the noncon-sensual testing of plaintiff by Army doctors for the Human–Immunodeficiency Virus (HIV), commonly known as the AIDS virus, and the limited disclosure of the results. Sadly, the test results were positive, indicating plaintiff's exposure to the AIDS virus. In this suit, plaintiff alleges that the Army and its agency, the Army Moral Support Fund (AMSF), forced him to resign solely because of the AIDS test results, thus breaching express and implied covenants of employment and implied covenants of good faith and fair dealing. Against his former supervisor, Colonel Ernest Isbell (Isbell), plaintiff asserts three additional claims:

> (1) violation of his constitutional right to privacy;
> (2) violation of his Fourth Amendment rights; and
> (3) the intentional infliction of emotional distress.

Plaintiff originally brought suit in the Northern District of California.[1] That court transferred the case to the Eastern District of Virginia pursuant to 28 U.S.C. §§ 1404(a) and 1406(a).[2] Venue for the claims against the Department of the Army and the AMSF is appropriate before this Court pursuant to 28 U.S.C. § 1391(e); for the claims against Isbell individually, venue is appropriate under 28 U.S.C. § 1391(b). Jurisdiction exists pursuant to 28 U.S.C. §§ 1331, 1346(a)(2) and 5 U.S.C. § 702. Plaintiff's state law claims are pendent. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

The defendants moved to dismiss or, in the alternative, for summary judgment on each of plaintiff's claims. Because matters

---

1. Plaintiff's suit, as originally filed, asserted a collection of constitutional, statutory, and common law violations by a number of plaintiff's supervisors, Army doctors, and other Army employees, in addition to defendants in the instant case. By stipulation, all other defendants and assorted other claims were dismissed in the Northern District of California. Plaintiff is currently pursuing his claim of wrongful termination under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*, before the United States Equal Employment Opportunity Commission (EEOC). The Court expresses no opinion on the merits of plaintiff's pending administrative claim.

2. More precisely, the claims against Col. Isbell in his individual capacity were transferred pursuant to 28 U.S.C. § 1406(a). Isbell's residence was disputed. Although plaintiff alleged that Isbell's official residence for tax purposes is in California, he currently lives and works in the Eastern District of Virginia. The claims against the Army and the AMSF were transferred under 28 U.S.C. § 1404(a).

outside the pleadings were submitted and considered by the Court, the motion was treated as one for summary judgment. Fed.R.Civ.P. 56. At a hearing on August 19, 1988, the Court granted defendants' motion for summary judgment with respect to the claims against the Army and the AMSF. Summary judgment was also granted to Isbell on plaintiff's Fourth Amendment and privacy claims. The claim against Isbell for intentional infliction of emotional distress was taken under advisement, and the parties were granted leave to file additional memoranda. Both parties submitted supplemental briefs which have now been considered by the Court. Additional oral argument on the remaining tort claim was heard on September 23, 1988. Based on oral arguments and a review of the briefs, affidavits, and supplemental memoranda filed by the parties, the Court now grants summary judgment to Isbell on the claim of intentional infliction of emotional distress. These various summary judgment rulings are the subject of this Memorandum Opinion.

### FACTS

The dispositive facts are undisputed; the case is, therefore, ripe for summary judgment. Fed.R.Civ.P. 56. Plaintiff Robert R. Plowman was hired by the AMSF, an agency of the Army, as a Music Specialist assigned to the music and theater program at Camp Humphreys in South Korea.[3] His employment officially began on September 24, 1985, for a one-year period, pursuant to a written appointment. In April, 1986, plaintiff, in writing, extended his employment until September 24, 1987.

Also in April, plaintiff sought treatment at the Army infirmary for treatment of injuries he had received in an off-duty altercation. Given the potential severity of his injuries,[4] he was medically transferred under emergency conditions to an Army hospital in Seoul. At the hospital, the admitting doctor, Dr. Pienkos, ordered an HIV test on plaintiff's blood as part of an extensive series of diagnostic blood tests. The HIV test was purportedly precautionary: if surgery became necessary, surgical personnel would then be aware of plaintiff's HIV status.[5] No surgical procedure was actually performed on plaintiff.

Plaintiff's consent for the HIV test was not sought, nor was he advised that the test was being performed.[6] Not until his discharge from the hospital one week later was plaintiff advised by Dr. Pienkos that an HIV test had been conducted and that the results were positive, thereby indicating the presence of the AIDS antibody.[7] A

---

3. The AMSF provides social, recreational, and welfare programs and activities on Army installations. *See* Army Regulation (AR) 215-1, § 2-1, at 7 (March 6, 1984).

4. Plaintiff complained of pain in his face and the left side of his body, and blood in his urine, the latter indicating possible renal injury.

5. Such testing may be medically reasonable and prudent given the increased risk of AIDS transmission to medical personnel during surgery. Recently promulgated regulations apparently recognize this. More than one year after the testing at issue here, a Pentagon Operations Directorate established guidelines for an admissions testing program in all Army hospitals. *See* Pentagon Operations Directorate § 1 (Oct. 1987); *cf.* Recommendations for Prevention of HIV Transmission in Health–Care Settings, 258 J.Am.Med.Ass'n 41 (Sept. 18, 1987) (recommending testing for those undergoing major surgery). Based on the recommendations of the Director of the AIDS program for the Centers for Disease Control, the admissions testing program ordered the HIV testing of all persons admitted to Army hospitals unless they had been previously tested within the past twelve months. *Id.* The testing program was designed, in part, "to ensure physicians were fully informed of a patient's health status." *Id.* For active duty personnel, the Directorate mandated only prior notification of the testing; for civilian employees, however, notification *and* informed consent were required. *Id.*

6. Defendants allege that, by consenting to treatment, plaintiff implicitly consented to the withdrawal of blood samples for diagnostic testing and, therefore, implicitly consented to the HIV test. There was no evidence, however, to suggest that HIV testing was, at that time, a routine feature of the standard diagnostic blood tests. In any event, resolution of this dispute is not necessary to the Court's ruling.

7. Positive results from the HIV test indicate the presence in a person's blood of antibodies to the AIDS virus. Persons who test positive, though they may demonstrate no symptoms of the AIDS-related complex (ARC) or AIDS, are infectious and can spread the disease to others. *See* Board of Trustees Report, *Prevention and Con-*

second nonconsensual HIV test conducted later in the United States confirmed the original positive results. Dr. Fullenkamp, a staff physician at the Camp Humphreys infirmary in Korea, allegedly "ordered" plaintiff to readmit himself to the hospital for possible medical treatment [8] and allegedly threatened to "turn him over" to the Korean authorities if he refused to cooperate.

Throughout plaintiff's employment, Isbell had command and general responsibility [9] for the health and welfare of all civilian Non–Appropriated Fund Instrumentalities (NAFI) employees,[10] including plaintiff. In accordance with that responsibility, Isbell asserts that he was required to be informed of any NAFI employee who had a serious medical condition or communicable disease that might pose a threat to others.[11] Accordingly, Dr. Fullenkamp reported plaintiff's test results to Isbell. Isbell then consulted with four other persons in his command on the appropriate course of action to take with respect to plaintiff. These persons were Donna Hewes, Chief of the Office of Civilian Personnel for the AMSF in South Korea; David Palmrose, Regional Chief for Camp Humphreys; John Baker, Isbell's civilian Deputy Com-

mander; and Lt. Col. David Merriam, Isbell's military Deputy Commander. Isbell informed them of plaintiff's name and HIV test results, but advised them to keep that information confidential.

On May 14, 1986, plaintiff met with Isbell and the four persons in whom Isbell had confided. At that meeting, Isbell or one of his subordinates allegedly told plaintiff that he should resign; if he refused, the South Korean civil authorities would be notified of his condition.[12] Only if he resigned, he was told, would the Army pay for his trip back to the U.S. and allow him to extend his insurance coverage. Plaintiff resigned effective September 25, 1986, the end of his official employment period, and remained on leave without pay until that time. He returned immediately to the United States. In South Korea, he left unpaid medical bills for his hospital treatment of approximately $1,640.[13]

## ANALYSIS

A. *Breaches of Contract and Implied Covenant of Good Faith and Fair Dealing*

Plaintiff charges that the Army and the AMSF breached his employment con-

---

*trol of Acquired Immunodeficiency Syndrome: An Interim Report,* 258 J.Am.Med.Ass'n 2097, 2101 (Oct. 16, 1987).

**8.** Plaintiff contends that this "order" and his subsequent stay in the hospital constituted a forced quarantine. Not surprisingly, defendants dispute that characterization and suggest that plaintiff voluntarily acceded to the hospital confinement to obtain medical care. Resolution of this dispute, however, is not essential to the disposition of the summary judgment motions at bar.

**9.** More precisely, Isbell served as the commander of the Community, Family, and Soldier Support Command for the Army in South Korea.

**10.** Non-appropriated Fund Instrumentalities (NAFI) employees are not paid from Congressional appropriation funds, but rather receive their salaries from income generated by the activity for which they are hired. *See* 10 U.S.C. §§ 4779(c) and 9779(c); *see also Army and Air Force Exchange Service v. Sheehan,* 456 U.S. 728, 730 n. 1, 102 S.Ct. 2118, 2120 n. 1, 72 L.Ed.2d 520 (1982); *Perez v. Army and Air Force Exchange Service,* 680 F.2d 779, 780–81 (D.C.Cir. 1982). NAFI's serve, however, as official instru-

mentalities of the United States. *See* AR 215–1, *supra* note 3, at § 2–2(b), at 7. The AMSF, for which Plowman worked, was such an activity.

**11.** Army policy at that time required that disclosure of HIV test results be limited to "medical and command personnel to the extent necessary to perform their required duties." HQDA LTR 40–86–1, Policy for Identification, Surveillance, and Disposition of Personnel Infected With Human T–Lymphotrophic Virus Type III (HLTV–III), ¶ 10(e)(1), at 5 (Feb. 1, 1986) [hereinafter AIDS Policy]. Pursuant to his command duties, Isbell clearly had an official need to know of potentially serious medical conditions of those personnel under his command.

**12.** Defendants dispute this account of the conversation, insisting that they merely informed plaintiff of his options, warned that available medical treatment for AIDS was limited or nonexistent in Korea, and suggested that return to more appropriate facilities in the United States would better serve his medical needs.

**13.** The Army also charged plaintiff with unspecified late charges, penalties, and interest for failure to pay that bill.

tract by forcing him to resign solely because he tested positive for the HIV virus. If proven, a coerced resignation directly contravenes Army regulations prohibiting such retaliatory action.[14] Yet plaintiff's claim has a fatal flaw: there was, in fact, no express or implied contract between plaintiff and the AMSF. NAFI employees, like all other civilian federal employees, serve by appointment, not contract. Indeed, applicable Army regulations explicitly reject the use of contracts for employing NAFI civilian personnel.[15] The federal form authorizing plaintiff's initial hiring similarly characterized the action as an "appointment/regular full-time."[16] Plaintiff's rights as a federal employee and remedies against the Army as an employer are thus determined by federal statutes and regulations, not by principles of contract law.[17] Accordingly, the Court grants defendants' motion for summary judgment on the breach of contract claims. There is, as a matter of fact, no contractual relationship between plaintiff and the Army or the AMSF. Plaintiff's claim that defendants breached an implied covenant of good faith and fair dealing derives solely from the alleged contract. See Restatement (Second) of Contracts § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing."); see also Entre Computer Centers v. FMG of Kansas City, Inc., 819 F.2d 1279, 1284 (4th Cir.1987). Thus, this claim, too, must fail given the absence of any contract.

From this, however, it does not follow that the Army and its instrumentalities could act with impunity to terminate plaintiff's appointment. Army regulations forbid using AIDS test results as a basis for termination. See HQDA LTR 40–86–1, Policy for Identification, Surveillance, and Disposition of Personnel Infected with Human T–Lymphotrophic Virus Type III (HLTV–III), ¶ 10(c)(5) at 4 (Feb. 1, 1986) [hereinafter AIDS Policy]. Whether that occurred in this instance is not before the Court, nor does the Court express any view on whether such facts, if proved, merit a remedy in plaintiff's EEOC action. See, supra, note 1.

## B. Violation of Constitutional Right to Privacy

■ Against Isbell individually, plaintiff asserts that Isbell violated his constitutional right to privacy by wrongfully disclosing to others confidential medical information, namely his HIV test results.[18] The Court,

14. Army regulations direct that
 [p]ositive results on the [HLTV–III] test will be confidential information and will not be the basis of any actions concerning the individual's employment.
 . . . .
 The presence of HLTV–III antibody will not by itself be the basis of any personnel action against an employee.
 AIDS Policy, supra note 11, at ¶ 10(c)(2) and (5), at 4.

15. Army regulations specifically note that "[c]ontracts will not be utilized for the employment of civilian and off-duty military personnel paid from nonappropriated funds." AR 215–3, supra note 3, at § 2–9(a). The only exceptions provided are for independent contractors and for those individuals employed on a special fee basis, such as sports referees. Id. at § 2–9(a)(1)–(2). Plaintiff's position does not fit within either exception.

16. Plaintiff claims that he never saw that employment form. That claim is irrelevant to the Court's determination that there was no contract; the employment form merely provides supporting evidence to confirm the regulations in effect at that time.

17. See Bell v. United States, 366 U.S. 393, 401, 81 S.Ct. 1230, 1235, 6 L.Ed.2d 365 (1961) (common law contract principles do not govern federal employment); Riplinger v. United States, 695 F.2d 1163, 1164 (9th Cir.1983) ("federal employees serve by appointment, not by contract"); Kizas v. Webster, 707 F.2d 524, 535 (D.C.Cir. 1983), cert. denied, 464 U.S. 1042, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984) (same); cf. Army and Air Force Exchange Service v. Sheehan, 456 U.S. 728, 738, 102 S.Ct. 2118, 2124, 72 L.Ed.2d 520 (1982) (no implied-in-fact contract created by Army and Air Force regulations); United States v. Larionoff, 431 U.S. 864, 870, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977) (rights of enlisted Navy personnel to compensation are statutory, not contractual).

18. Plaintiff mistakenly asserted a cause of action against Isbell under 42 U.S.C. § 1983. That statute subjects to liability "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia," deprives a citizen of his rights under the U.S. Constitution or federal laws. Isbell is, however, a federal official acting pursuant to federal, not state, law. Section 1983 is, therefore, inapplicable. See

however, finds that Isbell is entitled to qualified immunity because the precise constitutional right asserted by plaintiff—a privacy right in his medical condition—is neither clearly established nor absolute. Where, as here, the right alleged to have been violated has not been clearly established and the federal officer could have reasonably believed that his actions were lawful "in light of the clearly established law and the information [he] possessed," qualified immunity protects the federal officer from liability. *Anderson v. Creighton*, — U.S. —, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). *Accord Turner v. Dammon*, 848 F.2d 440 (4th Cir.1988); *Hansen v. Meese*, 675 F.Supp. 1482 (E.D. Va.1987).

Under the doctrine of qualified immunity, government officials are immune from civil damages liability for constitutional torts "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson*, 107 S.Ct. at 3038. The doctrine's evolution reflects the Supreme Court's struggle to reconcile sharply divergent interests: the need to assure to citizens full redress for violations of their constitutional rights balanced against the government's equally compelling interest in minimizing groundless disruptions from its operations. *See Anderson*, 107 S.Ct. at 3038; *Turner*, 848 F.2d at 444; *Hansen*, 675 F.Supp. at 1485. The balance struck in the qualified immunity standard encourages expeditious termination of meritless suits against government officials when their actions do not implicate clearly established rights. In such cases, courts should "resolve insubstantial claims on summary judgment." *Harlow v. Fitzgerald*, 457 U.S. 800, 813, 814–15, 818–19, 102 S.Ct. 2727, 2735, 2736–37, 2738–39, 73 L.Ed.2d 396 (1982). *See also Anderson*, 107 S.Ct. at 3039 n. 2; *Butz v. Economou*, 438 U.S. 478, 507, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978); *Hansen*, 675 F.Supp. at 1485.[19] Isbell is, therefore, entitled to summary judgment "unless there is a genuine issue as to whether [he] in fact committed a violation of clearly established law." *Turner*, 848 F.2d at 444.

The threshold question then is whether constitutional law clearly establishes plaintiff's alleged right to privacy in information concerning his medical condition or, more specifically, his AIDS status.[20] The Supreme Court has recognized that the United States Constitution clearly protects cer-

*Kotmair v. Gray*, 505 F.2d 744, 745 (4th Cir. 1974). Plaintiff does, however, have a cause of action directly under the Constitution for alleged violations by a federal official of his privacy and Fourth Amendment rights. *See, e.g., Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 397–98, 91 S.Ct. 1999, 2005–6, 29 L.Ed.2d 619 (1971) (implied cause of action to remedy Fourth Amendment violations); *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (same for Fifth Amendment violations). This Court, therefore, treats these claims as claims brought under the *Bivens* doctrine. *See O'Connor v. United States*, 669 F.Supp. 317, 323 (D.Nev.1987); *Graham v. United States*, 528 F.Supp. 933, 937 n. 4 (E.D.Pa.1981).

19. As the Fourth Circuit recently explained, "[q]ualified immunity thus protects government officials not only from liability, but from *trial*, in recognition of the fact that subjecting officials unnecessarily to trial leads to 'distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service.'" *Turner*, 848 F.2d at 444 [quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 816, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982)]. *See also Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) (qualified immunity serves as an executive official's "entitlement not to stand trial or face the other burdens of litigation" on insubstantial claims); *Harlow*, 457 U.S. at 819 n. 35, 102 `S.Ct. at 2738–39 n. 35 ("Insubstantial lawsuits undermine the effectiveness of government as contemplated by our constitutional structure....").

20. That plaintiff tested positive for AIDS, rather than for another, less politically-charged disease, is not relevant to the constitutional analysis. AIDS is a fatal, infectious disease; it is not a political or constitutional status. AIDS does not, therefore, confer on its victims any greater constitutional rights than are possessed by victims of other infectious or fatal maladies, such as herpes, tuberculosis, or cancer. By the same token, AIDS victims do not forfeit any constitutional rights by virtue of their AIDS status.

The Court is mindful, however, that AIDS may provoke heightened reactions among people, especially in foreign countries. This reaction could be a factor pertinent to the constitutional calculus where, as here, a right is not absolute and balancing is required.

tain areas of personal privacy.[21] In general, decisions recognizing a constitutional privacy interest refer to at least two categories of privacy: "[1] the individual interest in avoiding disclosure of personal matters, and ... [2] the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 600–01, 97 S.Ct. 869, 876–77, 51 L.Ed.2d 64 (1977) (and cases cited therein). Plaintiff's claim in the instant case invokes constitutional protection under the first cate-

gory. No controlling authority confirms the extension of the constitutional right in this category to medical information. There is authority supporting such a right; however, its scope is far from settled.[22] Indeed, courts continue to struggle to define that right, often reaching contrary decisions.[23] In these circumstances, one cannot fairly say that the nature of the alleged right was so clear that a reasonable official would have understood that anything Isbell

**21.** See, e.g., *Carey v. Population Services International*, 431 U.S. 678, 684, 685, 97 S.Ct. 2010, 2015, 2016, 52 L.Ed.2d 675 (1977) (privacy right of autonomy in making decisions regarding contraception is founded in Fourteenth Amendment's guarantee of personal liberty); *Nixon v. Administrator of Gen'l Services*, 433 U.S. 425, 458, 97 S.Ct. 2777, 2797–98, 53 L.Ed.2d 867 (1977) (privacy interest in protecting against disclosure of personal papers based, in part, on First Amendment freedom of political association); *Roe v. Wade*, 410 U.S. 113, 152–53, 93 S.Ct. 705, 726–27, 35 L.Ed.2d 147 (1973) (privacy right to make autonomous decision regarding procreation based on Fourteenth Amendment); *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (individual right to read whatever one chooses in privacy of own home based on First Amendment); *Katz v. United States*, 389 U.S. 347, 350, 88 S.Ct. 507, 510, 19 L.Ed.2d 576 (1967) (in dictum, noting that Fourth Amendment protects, in part, "individual privacy against certain kinds of governmental intrusion"); *United States v. Westinghouse Elec. Co.*, 638 F.2d 570, 577 (3d Cir.1980) (privacy right in one's own medical information); *Caesar v. Mountanos*, 542 F.2d 1064, 1067 (9th Cir. 1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 804 (1977) (privacy right in information given by patient to psychotherapist). *But see Katz v. United States*, 389 U.S. at 350–51, 88 S.Ct. at 510–11 (rejecting the existence of a "general constitutional 'right to privacy;'" rather, "the protection of a person's *general* right to privacy—his right to be let alone by other people—is, like the protection of his property and of his very life, left largely to the law of the individual States").

The Supreme Court further warned in *Katz* that "[v]irtually every governmental action interferes with personal privacy to some degree. The question in each case is whether that interference violates a command of the United States Constitution." *Katz*, 389 U.S. at 350 n. 5, 88 S.Ct. at 510 n. 5.

**22.** As plaintiff noted, at least three courts have found such a right. *See, e.g., United States v. Westinghouse Elec. Co.*, 638 F.2d 570 (3d Cir. 1980) (privacy right in employees' medical files); *Caesar v. Mountanos*, 542 F.2d 1064 (9th Cir.1976), *cert. denied*, 430 U.S. 954, 97 S.Ct.

1598, 51 L.Ed.2d 804 (1977) (patients' privacy right in psychotherapist's patient files); *Hawaii Psychiatric Society, Dist. Branch v. Ariyoshi*, 481 F.Supp. 1028 (D.Hawaii 1979) (same for psychiatrist's files). The other cases relied on by plaintiff do not specifically recognize a constitutional privacy right in medical or other personal information. *See In re Zuniga*, 714 F.2d 632, 641 (6th Cir.) (noting only that if privacy right exists, it is not absolute), *cert. denied*, 464 U.S. 983, 104 S.Ct. 426, 78 L.Ed.2d 361 (1983); *General Motors Corp. v. Nat'l Dir. for Occupational Safety and Health, Dept. of Health, Education and Welfare*, 636 F.2d 163 (6th Cir.1980), *cert. denied*, 454 U.S. 877, 102 S.Ct. 357, 70 L.Ed.2d 187 (1981) (the existence of an issue of constitutional privacy not reached because adequate safeguards in place to protect against unwarranted disclosure of employees' medical files).

The Fourth Circuit has also acknowledged that an interest in the nondisclosure of personal information is constitutionally based, but not absolute. In *Taylor v. Best*, 746 F.2d 220 (4th Cir.1984), the court rejected a prisoner's claim that disclosure of his family history to a prison psychologist violated his constitutional privacy right. *Id.* at 225. There, the prisoner's privacy right was weakened by the psychologist's assurance of confidentiality and outweighed by the compelling public interest in prison security and rehabilitation. *Id.* The Fourth Circuit has not, however, further defined or extended the scope of that privacy right.

In any event, the Supreme Court has yet to resolve the precise issue presented in the case at bar.

**23.** *Compare, e.g., Westinghouse Elec. Co.*, 638 F.2d 570 (3d Cir.1980) (qualified privacy right in employees' medical files) and *Caesar v. Mountanos*, 542 F.2d 1064 (9th Cir.1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 804 (1977) (patient's privacy right in psychotherapist's patient files) *with Borucki v. Ryan*, 827 F.2d 836 (1st Cir.1987) (no clearly established constitutional privacy right in preventing public disclosure of psychiatric evaluation) and *J.P. v. DeSanti*, 653 F.2d 1080, 1091 (6th Cir.1981) ("not all rights of privacy or interests in nondisclosure of private information are of constitutional dimension").

did violated that rights. As *Anderson* teaches, these are precisely the circumstances justifying the application of the qualified immunity doctrine. To defeat qualified immunity, *Anderson* requires that

> the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, [citation omitted]; but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Anderson*, 107 S.Ct. at 3039. Here, Isbell's actions did not implicate a clearly established constitutional right, nor were his actions inconsistent with any such right. He is, therefore, entitled to qualified immunity. *See Anderson*, 107 S.Ct. at 3038; *Turner*, 848 F.2d at 444.

Even assuming, *arguendo*, that the alleged privacy right exists, Isbell did not infringe plaintiff's right. Rather, Isbell's limited disclosure reasonably accommodated that right given all the circumstances. Put another way, a privacy right of this nature is not absolute or unqualified. There may be circumstances, such as those at bar, where limited disclosure is permissible and does not violate the right. *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed. 2d 64 (1977), is instructive in this regard. There, a group of patients challenged a state law requiring that physicians report to the state health department all prescriptions for certain dangerous, albeit legal, drugs. *Whalen*, 429 U.S. at 594, 97 S.Ct. at 873. With the resulting records, state officials planned to track the dispensing of those drugs and thereby prevent their diversion into illegal channels. *Id.* at 591–92, 97 S.Ct. at 872. Plaintiffs, however, claimed that the law violated their privacy rights. Specifically, they feared that the names of persons using the designated drugs would be accidentally or intentionally disclosed to the public; that fear would, in turn, deter them and others from seeking treatment with the drugs they needed. *Id.* at 596, 97 S.Ct. at 574–75. The Supreme Court rejected their claim; it was satisfied that the security measures implemented by the state would adequately protect the confidentiality of the patients. The reporting requirement did not, "on its face, pose a sufficiently grievous threat to either [privacy] interest to establish a constitutional violation." *Id.* at 601, 97 S.Ct. at 877.

Especially significant for the case at bar, the Supreme Court also found that the required disclosures of that private information to "authorized employees" of the state health department were not "meaningfully distinguishable from a host of other unpleasant invasions of privacy that are associated with many facets of health care." *Id.* at 603, 97 S.Ct. at 878. More specifically, disclosures to state health department employees did not "automatically amount to an impermissible invasion of privacy." *Id.* The same reasoning and result should obtain here. Isbell's limited disclosure to U.S. Army personnel with varying degrees of responsibility for plaintiff's health and well-being did not infringe plaintiff's qualified privacy right. Moreover, the confidentiality protections provided by the Army's regulations adequately guarded against unwarranted disclosures of plaintiff's AIDS status. *See* AIDS Policy, *supra*, ¶ 10(c)(2) at 4. Isbell adhered to these regulations.

Fairly read, *Whalen* also suggests that any constitutional privacy right in one's medical condition is not absolute. Compelling government interests may outweigh that right and justify its infringement. *See Taylor v. Best*, 746 F.2d 220, 225 (4th Cir. 1984); *In re Zuniga*, 714 F.2d 632, 641 (6th Cir.), *cert. denied*, 464 U.S. 983, 104 S.Ct. 426, 78 L.Ed.2d 361 (1983); *United States v. Westinghouse Elec. Co.*, 638 F.2d 570, 577 (3d Cir.1980); *Caesar v. Mountanos*, 542 F.2d 1064, 1068 (9th Cir.1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 804 (1977). The Third Circuit's decision in *United States v. Westinghouse*

*Elec. Co.*, 638 F.2d 570 (3d Cir.1980) is especially apt here. In *Westinghouse*, the Third Circuit found that the required disclosure by a private corporation to a government health and safety agency of employee medical files did not necessarily violate the employees' rights to privacy. *Id.* at 577. The court acknowledged that a privacy right in that information exists, but cautioned that it was not absolute. *Id.* Rather, the need of the government to gather the information was balanced against the individual's right to keep the files private. *See id.* at 577–78. In that case, the balance favored the government. *See id.* at 580.

In the instant case, as in *Westinghouse*, Isbell's disclosure of arguably confidential medical information was no broader than reasonably necessary to determine how to proceed in a sensitive situation. Moreover, his disclosure was coupled with precautionary directions to keep the matter on "closehold," *i.e.*, strictly confidential. Isbell did not give plaintiff's medical files to someone outside of his command, nor did he publish that information to the public. Rather, his disclosure was reasonable and limited. Significantly, the limited disclosure was designed to assist Isbell in making a potentially difficult command decision on an Army base overseas. Important government interests served by limited disclosure under these circumstances clearly outweigh plaintiff's interest in preventing that disclosure to four persons. Isbell did not, therefore, unconstitutionally infringe any privacy right to which plaintiff was entitled.[24]

## C. *Violation of Fourth Amendment Rights*

Plaintiff also charges Isbell with violating his Fourth Amendment rights. The nonconsensual HIV testing of plaintiff's blood was, he claims, a violation of his Fourth Amendment right to be secure in his person from unreasonable searches and seizures. Specifically, the alleged "search" was unreasonable because it was medically unnecessary and without plaintiff's knowledge or consent. Plaintiff contends that Isbell, pursuant to his official duties, was obligated to enforce the Army's explicit policy prohibiting nonconsensual testing of civilian employees and to protect plaintiff, as an employee under his command, from violations of that policy. *See* AIDS Policy, *supra*, ¶ 10(c)(1) at 4. Isbell's failure to do so and his disclosure of plaintiff's test results allegedly ratified a Fourth Amendment violation by Army physicians.

■ The Court need not decide whether protection from nonconsensual HIV testing fits within the scope of the Fourth Amendment's guarantees.[25] Isbell's connection with and responsibility for the actual testing is too remote to support liability. He neither ordered nor performed the HIV tests. Moreover, plaintiff has offered no evidence sufficient to raise an issue of fact that Isbell approved or ratified the doctors'

---

24. Even if Isbell's actions violated plaintiff's constitutional rights, the protection of qualified immunity is not automatically stripped away. *See Osabutey v. Welch*, 857 F.2d 220, 223 (4th Cir.1988) [citing *Giancola v. State of W.Va. Dept. of Public Safety*, 830 F.2d 547, 550 (4th Cir.1987)]. If Isbell reasonably, but mistakenly, believed that his actions were constitutional, then he is entitled to immunity. *See Osabutey*, 857 F.2d at 223.

25. Recently, one court found that such testing violates the Fourth Amendment. In *Glover v. Eastern Nebraska Community Office of Retardation*, 686 F.Supp. 243, 250 (D.Neb.1988), the court struck down as unconstitutional a mandatory blood testing policy for certain county employees of a health services agency. The covered employees dealt directly with mentally retarded clients. The policy included testing for tuberculosis, hepatitis B and the AIDS virus, and was designed to protect both employees and clients from the spread of these infectious diseases. *Id.* at 247. The court, however, found that the testing policy was not necessary for their protection: the "theoretical risk" to healthy clients or employees of infection from an infected client or employee was "extremely low and approach[ed] zero." *Id.* at 250–51. The blood test, therefore, constituted an unreasonable search and seizure in violation of the Fourth Amendment. *Id. But see Local 1812, Am. Fed. of Gov't Employees v. United States Department of State*, 662 F.Supp. 50 (D.D.C. 1987) (rejecting Fourth Amendment challenge to AIDS testing as part of overall health test); *United States v. City and County of San Francisco*, 699 F.Supp. 762 (N.D.Cal.1988) (unpublished opinion) (same).

decision to test. Summary judgment is, therefore, appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (Plaintiff has failed to offer "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").

█ In the alternative, even assuming a direct connection with the HIV testing, Isbell is entitled to qualified immunity. Although the constitutional protection against unreasonable searches and seizures is a clearly established right, the extension of that protection to an AIDS test on a blood sample already extracted for other purposes is far from clear. In *Winston v. Lee*, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), the Supreme Court established a balancing test to determine when an invasion of one's body cavity or bodily fluids is unreasonable for purposes of the Fourth Amendment. *Id.* at 760, 105 S.Ct. at 1616. In that case, the Court found that subjecting a defendant to surgery with general anesthesia to remove a bullet constituted an unreasonable intrusion into a person's "right to be left alone." *See id.* at 766, 105 S.Ct. at 1619–20. The intrusion, according to the Court, was substantial and the reason noncompelling; other evidence was available to connect the defendant with the crime. *Id.* at 765–66, 105 S.Ct. at 1619. Here, in contrast, the intrusion was significantly less invasive. In fact, the blood sample necessary for plaintiff's HIV test had already been extracted for the purposes of other, arguably consensual diagnostic tests; no further extractions or intrusions were necessary.[26] Moreover, the reason for testing was more compelling than that offered in *Winston;*

namely, Army surgical personnel had a medical need to know a patient's HIV status in the event that surgical procedures became necessary.[27]

Two recent cases support this conclusion. In *United States v. City and County of San Francisco*, No. 84–7089 (N.D.Cal. Aug. 28, 1987) (unpublished opinion), a district court found that the use of a person's blood sample for an HIV test was reasonable when that sample was already required for a series of other diagnostic tests. Similarly, in *Local 1812, Am. Fed. of Gov't Employees v. United States Dept. of State*, 662 F.Supp. 50 (D.D.C. 1987), the court refused to enjoin HIV testing as part of an established health testing program for Foreign Service employees. As in *San Francisco* and the instant case, the testing in *Local 1812* was simply one aspect of an already-established series of extensive diagnostic blood tests for employees. *Local 1812*, 662 F.Supp. at 52. Equally pertinent to the case at bar, the union representing those employees challenged the additional HIV testing as, *inter alia*, a violation of constitutional privacy rights and an unreasonable search in violation of the Fourth Amendment. Plaintiffs' argument there focused primarily on the unproven effectiveness of HIV testing to halt the spread of AIDS, the government's alleged purpose for the testing. *Id.* at 53. The ineffectiveness of the tests to achieve that purpose, according to plaintiffs, rendered the government interest insufficiently compelling to defeat the employees' constitutional rights. The *Local 1812* court was not persuaded and found insufficient likelihood of success on the merits to justi-

---

**26.** In appropriately limited circumstances, even the forcible taking of a blood sample has been found to be reasonable. In *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the Supreme Court approved as a reasonable search incident to arrest, the forced taking of a blood sample from a suspected intoxicated driver to measure his blood alcohol level. Key to the *Schmerber* Court's finding of reasonableness were the minimal intrusion required to extract the sample, the reasonable testing method, and the exigent circumstances justifying the use of that method. Here, the physical intrusion is, if anything, of lesser significance; the sample had already been extract-

ed. The gravamen of plaintiff's claim, however, goes beyond the extraction of his blood to challenge the government's use of the blood sample to uncover unauthorized information about his physical condition.

**27.** In contrast, there was no evidence presented to suggest that the Army physicians' failure to inform plaintiff that the HIV test was being conducted was medically necessary. Given the circumstances, the physicians should have given plaintiff notice of the test. Their failure to do so, however, is irrelevant to the issues at bar.

fy the injunctive relief sought. *Id.* The court noted that the tests were implemented to test an employee's "fitness for duty in a specialized government agency," a duty that was often fulfilled overseas, rather than to halt the spread of AIDS infection. *Id.* The addition of HIV testing to the standard battery of tests required for employees was thus rationally related to a specific, legitimate government purpose. *Id.*

The case at bar presents similar, and perhaps even stronger, justifications for the additional HIV test. The medical necessity of informing surgical personnel of a patient's HIV status might be sufficiently compelling to override plaintiff's privacy interests. Any Army officer standing in Isbell's shoes, therefore, could have reasonably believed that his actions were lawful and, indeed, necessary for the protection of those persons in his command. Thus, the Court finds that Isbell is entitled to qualified immunity on plaintiff's Fourth Amendment claim.

### D. *Intentional Infliction of Emotional Distress*

 Plaintiff also claims that he is a victim of emotional distress intentionally inflicted by Isbell. Specifically, plaintiff claims that the following alleged actions by defendant constituted such intentional infliction: defendant Isbell ratified unwarranted, nonconsensual AIDS tests; improperly disclosed the results of those tests; threatened to notify the Korean authorities of plaintiff's condition if he refused to resign; allowed his subordinates to threaten plaintiff; and forced him to be "quarantined" unnecessarily in the hospital pending his return to the United States. Because Isbell's actions were discretionary and within the scope of his employment, he is absolutely immune from state tort liability.

The doctrine of absolute immunity shields Isbell from liability from common law tort claims arising out of his official responsibilities. That shield, however, "should be available only when the conduct of federal officials is within the scope of their official duties *and* the conduct is discretionary in nature." *Westfall v. Erwin,* — U.S. ——, 108 S.Ct. 580, 584, 98 L.Ed. 2d 619 (1988) (emphasis in original). Moreover, in *Westfall v. Erwin,* a unanimous Supreme Court admonished courts to consider "whether the contribution to effective Government in particular contexts outweighs the potential harm to individual citizens." *Id.* at 585. Thus, a trial court must determine (1) whether the federal official's actions were within the scope of his or her employment, (2) whether the official exercised more than minimal discretion in his duties, and (3) whether the balance of the government's interest in immunity against the potential harm to aggrieved citizens favors the granting of absolute immunity.

In this case, there can be no serious question that Isbell's actions were within the scope of his official responsibilities.[28] As commander of civilian employees of AMSF, defendant exercised command responsibility over plaintiff. In that capacity, he was charged with the duty of safeguarding the general health and welfare of the civilians in his command. When Army physicians reported plaintiff's test results to Isbell, he faced a difficult personnel dilemma. Resolution of that dilemma was clearly within the scope of his official responsibilities.

In choosing how to respond to the issues posed by plaintiff's condition, Isbell also exercised more than minimal discretion. Absolute immunity only shields discretionary acts of federal officials. *See Westfall,* 108 S.Ct. at 585. Discretionary acts, though not precisely defined, generally involve the exercise of judgment. *See Strothman v. Gefreh,* 739 F.2d 515, 519 (10th Cir.1984); *Rochon v. F.B.I.,* 691

---

**28.** *See Ricci v. Key Bancshares of Maine, Inc.,* 768 F.2d 456, 462 (1st Cir.1985) [quoting *Spalding v. Vilas,* 161 U.S. 483, 486, 16 S.Ct. 631, 632, 40 L.Ed. 780 (1896) ] ("The conduct in question need only be more or less connected to 'the general matters committed by law to [defendant's] control or supervision' and not 'manifestly or palpably beyond his authority.' "); *see also D.C. Metropolitan Police,* 812 F.2d 1425, 1429 (D.C.Cir.1987) (adopting same standard), *reh'g granted* and *vacated, in part, on other grounds,* 817 F.2d 144 (D.C.Cir.1987). This case clearly falls within the boundaries established by those cases.

F.Supp. 1548 (D.D.C.1988). In this inquiry, courts must "evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions." *Forrester v. White*, —— U.S. ——, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988). The threat of personal liability for discretionary conduct pursuant to official duties may well induce federal officials to "act with an excess of caution or otherwise to skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct." *Forrester*, 108 S.Ct. at 542. As the Supreme Court has warned, "exposing government officials to the same legal hazards faced by other citizens may detract from the rule of law instead of contributing to it." *Id.*

The Court rejects plaintiff's argument that Isbell's actions were not discretionary because they allegedly contravened Army regulations.[29] The regulations at issue provide, *inter alia*, that "[p]ositive results on the [HIV] test will be confidential information;" disclosure is, however, permitted to "medical and command personnel to the extent necessary to perform their required duties." *See* AIDS Policy, *supra*, ¶ 10(c)(2) at 4. At no point do the regulations forbid *any* disclosure except to the patient. On the contrary, the regulations, fairly read, contemplate circumstances where, as here, limited disclosure is appropriate.

Without doubt, plaintiff's condition posed a novel personnel problem for Isbell. At the time of this incident, Army regulations provided a framework for dealing with AIDS testing and, more specifically, with civilian employees who tested positive for the AIDS virus.[30] The regulations did not, however, dictate a course of action for the precise situation presented here. Rather,

they called on officers to "apply common sense and good judgment in light of current medical knowledge about HTLV–III infection and after consideration of each soldier's specific medical condition and duties." *See id.* ¶ 12(c) at 7. When confronted with a politically sensitive situation —a civilian under his command who tested positive for the AIDS virus in a foreign country—Isbell exercised his common sense and judgment in deciding on a course of action. In summary, Isbell faced a difficult personnel situation of first impression. Army regulations provided some guidance, but did not dispositively prescribe a course of action. Isbell exercised his discretion and sought the advice of four other persons under his command. His handling of the matter was clearly discretionary.

As a final inquiry, the Court must consider whether absolute immunity, in this context, would serve the purposes underlying the doctrine. Key to this determination is a careful examination of the potential effect of liability on defendant's performance of his official duties: "[b]ecause the benefits of official immunity lie principally in avoiding disruption of governmental functions, the inquiry into whether absolute immunity is warranted in a particular context depends on the degree to which the official function would suffer under the threat of prospective litigation." *Westfall*, 108 S.Ct. at 583 n. 3.

That threat, the Court recognizes, may not always act as a negative incentive; indeed, the threat of liability may very well encourage federal officials to act in strict accordance with the law. *See Forrester*, 108 S.Ct. at 542. The danger, however, is that the federal official acting under the cloud of potential liability may not fully carry out his or her responsibilities or may

---

**29.** In an analogous scheme under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), otherwise discretionary actions lose their protection from suit under a statutory "discretionary function exception" should they directly contravene a federal statute, regulation or specific policy. *See Berkovitz v. United States*, —— U.S. ——, 108 S.Ct. 1954, 1958–59, 100 L.Ed.2d 531 (1988). In the instant case, however, Isbell's disclosures did not explicitly contravene any statute, regulation, or specific policy of the Army.

**30.** The regulations forbade mandatory, nonconsensual AIDS testing of civilian employees. *See* AIDS Policy, *supra*, ¶ 10(c)(1) at 4. Because Isbell's connection with the HIV testing is too remote, the alleged violation of this regulation is not before the Court. The regulations also explicitly warned that no personnel actions should be taken against an employee solely because of those test results. *Id.* at ¶ 10(c)(5) at 4. As previously noted, plaintiff's wrongful termination claim based on this provision is the subject of his EEOC claim and is, therefore, not decided by this Court. *See, supra,* note 1.

act solely to prevent liability. Such caution inevitably handicaps the effective administration of our government.

In this case, the Court finds that the decision required of Isbell is precisely that kind of official function that is particularly sensitive to the threat of litigation. The nature of the personnel decision required by Isbell here was complicated by several factors: first, the employee was based in a foreign country;[31] second, the medical condition of plaintiff posed a potentially political problem for the Army and the officials of that country; and third, this particular problem was apparently one of first impression for the officers in South Korea.

The final decision thus called on Isbell to exercise significant discretion and personal judgment. The Court does not pass judgment on the wisdom or appropriateness of Isbell's ultimate decision regarding plaintiff, but rather notes only that the absolute immunity granted in this context serves the underlying goals of the doctrine.[32]

Accordingly, defendants' motion for summary judgment is granted. An appropriate order will be entered.

---

**31.** The Army's policy on AIDS testing specifically noted that soldiers who had tested positive would not be assigned to or allowed to reenlist for overseas duty. *See* AIDS Policy, *supra* note 11, at 1; *cf. Local 1812,* 662 F.Supp. at 52 (increased medical risk to Foreign Service employees assigned overseas offered by State Department as justification for similar HIV testing policy).

**32.** Even were this not the case, it is doubtful that the complaint states a valid claim of intentional infliction of emotional distress. The actions alleged by plaintiff against Isbell do not rise to the level of outrageous conduct required under Virginia law for intentional infliction of emotional distress. *See Womack v. Eldridge,* 215 Va. 338, 141–42, 210 S.E.2d 145, 148 (1974). This assumes that Virginia law governs, a conclusion that is far from clear.

The choice of law problem presented is not without its complexities. First, this case was transferred from the Northern District of California pursuant to §§ 1404(a) and 1406(a). Under *Van Dusen v. Barrack,* 376 U.S. 612, 639, 84 S.Ct. 805, 820–21, 11 L.Ed.2d 945 (1964), the transferee court must apply the law of the transferor state to state law claims transferred under § 1404(a). In this case, however, plaintiff's claims transferred under § 1404(a), namely the contract claims against the Army, are federal claims; therefore, *Van Dusen* does not apply.

Plaintiff's claims against Isbell were transferred pursuant to § 1406(a). Because venue was not proper in the transferor court, *Van Dusen* does not govern, and this Court must apply the Virginia law, including Virginia's choice of law rules, to plaintiff's state tort claim. *See, e.g., Ellis v. Great Southwestern Corp.,* 646 F.2d 1099 (5th Cir.1981); *Martin v. Stokes,* 623 F.2d 469 (6th Cir.1980) *Weber v. McDonald's System of Europe, Inc.,* 660 F.Supp. 10 (D.Del.1985). To hold otherwise would allow plaintiff to file claims in a court without proper venue simply to ensure the application of favorable laws of that forum.

Second, in tort actions, Virginia conflicts law applies the substantive law of the place of the wrong. *Morrissey v. William Morrow & Co.,* 739 F.2d 962, 968 (4th Cir.1984) [citing *McMillan v. McMillan,* 219 Va. 1127, 253 S.E.2d 662 (1979) ]. In this case, the alleged wrong occurred in South Korea. Every other aspect of the case, however, was tied to the United States: plaintiff was an American citizen, defendants were United States government agencies or officials thereof, and the incidents at issue occurred within the confines of American military bases. The Court rejects the notion that foreign law should apply to tortious injury suffered by an American citizen employed by the United States government at the hands of American citizens on a United States military base abroad.

Third, neither California or Virginia have significantly greater contacts with the parties or, in particular, interest in the alleged incidents. Plaintiff currently lives in California, and Isbell lives in Virginia. That is apparently the extent of each state's connection with the controversy.

The parties, in their briefs, did not address in any detail the conflicts dilemma. As a practical matter, however, there may be no significant difference in the results obtained under California and Virginia tort law as applied to the facts of this case. *Compare Cole v. Fair Oaks Fire Protection District,* 43 Cal.3d 148, 729 P.2d 743, 233 Cal.Rptr. 308 (1987) [citing *Agarwal v. Johnson,* 25 Cal.3d 932, 160 Cal.Rptr. 141, 603 P.2d 58 (1979) ] (prima facie case of intentional infliction claim requires "(1) outrageous conduct by defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering, and (4) actual and proximate causation of the emotional distress") *with Womack v. Eldridge,* 215 Va. 338, 210 S.E.2d 145, 148 (1974) (as noted above, requiring, *inter alia,* outrageous conduct by defendant). In any event, a final determination of the conflicts issue is not necessary to the summary disposition of this issue on the ground of absolute immunity.